# LOAN AND AIRCRAFT SECURITY AGREEMENT (S/N 22102)

THIS LOAN AND AIRCRAFT SECURITY AGREEMENT (S/N 22102) (together with all Addenda and Annexes hereto, this "Agreement") is dated as of December 30, 2009 (the "Closing Date"), by and between JUSTICE AVIATION, LLC, a West Virginia limited liability company ("Borrower") and RBS ASSET FINANCE, INC., a New York corporation ("Lender").

In consideration of the mutual agreements contained herein, and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

Capitalized terms used but not otherwise defined herein or in any addenda hereto shall have the meanings ascribed to them in Annex A attached hereto and made a part hereof.

Section 1. Terms of Loan.

1.1    Loan. Subject to the terms and conditions of this Agreement, Lender agrees to make a loan to Borrower in the principal amount set forth in Annex B (the "Loan") attached hereto and made a part hereof. The Borrower's obligation to repay the Loan shall be evidenced by a Promissory Note dated the Closing Date, payable by Borrower to the order of Lender in the original principal amount of the Loan (as amended, modified, restated, extended and renewed from time to time, the "Note"). The Loan shall bear interest and be repaid by Borrower at the times and in the manner set forth in the Note.

1.2    Prepayment. The Loan may be prepaid only in the manner and subject to terms and conditions set forth in the Note and, if applicable, Section 4.7 hereof. Any prepayment shall be accompanied by the applicable Prepayment Fee.

1.3    Use of Proceeds. Borrower shall use the proceeds of the Loan to finance or refinance the costs of the acquisition of the Aircraft.

Section 2. Conditions of Borrowing. Lender's obligation to make the Loan shall be both subject to and conditioned upon the satisfaction of all of the following: (a) at the time of the making of the Loan, this Agreement and each of the Loan Documents are in full force and effect and have not been invalidated, repudiated or terminated for any reason whatsoever; (b) all of the conditions precedent specified above and in the Closing Terms Addendum attached hereto and made a part of this Agreement, have been previously satisfied; (c) at the time of the making of the Loan, there is no Default or Event of Default; (d) at the time of the making of the Loan, all representations and warranties of Borrower and any other party (other than Lender) hereunder or in any of the other Loan Documents are true and correct in all respects and (e) there has been no material adverse change in the financial condition, business or operations of Borrower since December 31, 2008 or its ability to comply with the Loan Documents since the Closing Date, as determined by Lender, in its reasonable discretion and in good faith.

Section 3. Representations and Warranties. In order to induce Lender to enter into this Agreement and to make the Loan, Borrower represents and warrants to Lender that:

(a)    Borrower (i) has the form of business organization set forth in Annex D hereto and is and will remain duly organized, validly existing and in good standing under the laws of the state of its organization set forth in Annex D hereto, (ii) is duly qualified to do business in each jurisdiction in which the conduct of its business or the ownership or operation of its assets requires such qualification, including the jurisdiction of the primary hangar location of the Aircraft; (iii) has the necessary authority and power to own and operate the Aircraft and its other assets and to transact the business in which it is engaged; (iv) is a "citizen of the United States" within the meaning of the Transportation Code; and (v) has full power, authority and legal right to execute and deliver this Agreement, the Note and the other Loan Documents, to perform its obligations hereunder and thereunder, to borrow hereunder and to grant the assignment and security interest created by this Agreement;

(b)    Borrower's name as shown in the preamble of this Agreement is Borrower's exact legal name as shown on its charter, by-laws, articles of organization or operating agreement each as may be amended;

(c)     Borrower's state-issued organizational identification number (if any) administrator, professional user entity and the chief executive office and principal place of business address of Borrower are all as set forth on Annex D hereto. Borrower is "situated" in a country that has ratified or acceded to the Cape Town Convention within the meaning of Article 4 of the Convention;

(d)     no consent of any other party (including any stockholders, members trustees or holders of indebtedness), and no consent, license, approval or authorization of, exemption by, or registration or declaration with, or notice to, any governmental body, authority, bureau or agency is required in connection with the execution, delivery or performance by Borrower of this Agreement, the Note and the other Loan Documents, or the validity or enforceability of this Agreement, the Note and the other Loan Documents, except for (solely with respect to Borrower's being vested with title to, and the perfection and first priority of the Lender's Lien against, the Aircraft Collateral) recordation of this Agreement with the FAA, the filing of UCC financing statements in the appropriate recording offices and the making of all necessary registrations and discharges with the International Registry, including, to register the Lender's Lien in each Airframe, Engines (including all associated rights associated with or secured thereby and the related international interests), proceeds and other Collateral with the International Registry, which shall have been duly effected concurrently with Lender making the Loan;

(e)     the execution, delivery and performance by Borrower of this Agreement, the Note and the other Loan Documents do not and shall not violate any provision of any Applicable Law, will not violate any provision of Borrower's organizational documents and will not violate any provision of or cause a default under any mortgage, indenture, contract, agreement or other undertaking to which Borrower is a party or which purports to be binding upon Borrower or upon any of its assets, and will not result in the creation or imposition of any Lien on any of the assets of Borrower other than the security interest intended to be created hereby;

(f)     each of this Agreement, the Note and the other Loan Documents has been duly authorized, executed and delivered by Borrower and constitutes the legal, valid and binding obligation of Borrower enforceable in accordance with its terms (including, without limitation, the grant of Lender's Lien), except to the extent that the enforcement of remedies may be limited under applicable bankruptcy and insolvency laws, and the equitable discretion of any court of competent jurisdiction;

(g)     there is no action, suit, investigation or proceeding before any court, administrative officer or administrative agency that is pending or, to the best of Borrower's knowledge, threatened against or affecting Borrower or any of its assets nor is there any dispute between Borrower and any governmental regulatory body or other Person involving the Aircraft or any of the transactions contemplated by this Agreement and the other Loan Documents or which, if adversely determined, could have (i) an adverse effect upon the transactions contemplated by this Agreement and the other Loan Documents, the ability of Borrower to perform its obligations under the Loan Documents or Lender's interest in the Aircraft, or (ii) a material adverse effect on the business, operations or financial condition of Borrower (collectively, a "Proceeding"). Borrower has no pending claims and has no knowledge of any facts upon which a future claim may be based, against any prior owner, the manufacturer or supplier of the Aircraft, or of any Engine or part thereof for breach of warranty or otherwise;

(h)     (i) Borrower has good and marketable title to the Aircraft subject to no Liens except the Lender's Lien and the Contract of Sale created by the sale of the Aircraft by Supplier to Borrower; (ii) the Lender's Lien constitutes a legal, valid and continuing first priority security interest in the Collateral, free and clear of all other Liens except Permitted Liens; and (iii) all filings, recordings or other actions necessary or desirable in order to establish, perfect and give first priority to such security interest (including, the filing of this Agreement with the FAA and the registration of Lender's international interest with the International Registry) have been duly effected, and all Impositions in connection therewith have been duly paid;

(i)     Borrower is not in default, and no event or condition exists which after the giving of notice or lapse of time or both would constitute an event of default, under any mortgage, indenture, contract, agreement, judgment or other undertaking to which Borrower is a party or which purports to be binding upon Borrower or upon any of its assets;

(j)     all financial statements of Borrower, copies of which have been heretofore delivered to Lender, are complete and correct, and present fairly the financial position of Borrower as at the date thereof and the results

of its operations for the period ended on said date and there has been no material adverse change in the financial condition, business or operations of Borrower since the date thereof;

(k)  Borrower has filed all Federal, state and local income tax returns that are required to be filed and has paid all taxes as shown on said returns and all assessments received by it to the extent that such taxes and assessments have become due, and Borrower does not have any knowledge of any actual or proposed deficiency or additional assessment in connection therewith;

(l)  (i) Borrower is in possession of and has unconditionally, irrevocably and fully accepted the Aircraft, (ii) the Aircraft remains airworthy and otherwise in good working order, repair and condition and fully equipped to operate as required under Applicable Standards for its purpose, and remains in conformity with the requirements of the related purchase agreements and the Applicable Standards, (iii) all of the avionics set forth on Schedule A to Annex C hereto are on board the Aircraft referenced in such Annex and are in proper working condition, and (iv) the Aircraft is primarily hangared at the location set forth on Annex D hereto;

(m)  there shall be no Registerable Interests registered with the International Registry with respect to the Aircraft or of the other Aircraft Collateral, and Borrower will not permit any Registerable Interests to be registered with the International Registry except (1) for the sale of the Aircraft by Supplier to Borrower, (2) with respect to the Lender's Lien in the Aircraft Collateral or (3) as otherwise consented to in writing by Lender;

(n)  Borrower is a transacting user entity, has appointed an administrator and has designated a Professional User Entity acceptable to Lender. Borrower has paid all required fees and taken all actions necessary to enable Lender to register any international interest with the International Registry;

(o)  Borrower has the power to grant any security interests international interests, collateral assignments, security assignments and other interests constituting the Lender's Lien, each within the meaning of Article 7 of the Convention;

(p)  each of the Engines has at least 1,750 pounds of thrust or the equivalent horsepower and/or 550 rated take-off horsepower or equivalent thereof;

(q)  the information contained in Annex C (including the registration number of the Airframe, the serial numbers of the Airframe and the Engines, and manufacturer and model numbers of the Airframe and Engines) are true and accurate in all respects;

(r)  a IDERA in favor of Lender with respect to the Aircraft has been duly executed and delivered by an authorized representative of Borrower;

(s)  the Guaranty does not contravene or constitute a default under any Applicable Law, or any contract, mortgage, agreement, indenture, or other instrument to which Guarantor is a party or by which it may be bound;

(t)  the Guaranty has been duly executed and delivered by Guarantor and constitutes a legal, valid and binding obligation of Guarantor enforceable in accordance with its terms except to the extent that the enforcement of remedies may be limited under applicable bankruptcy and insolvency laws, and the equitable discretion of any court of competent jurisdiction;

(u)  there are no proceedings pending or, so far Guarantor knows, threatened against or affecting Guarantor or any of its property before any court, administrative officer or administrative agency that, if decided adversely, could affect the financial condition or operations of Guarantor or the ability of Guarantor to perform its obligations under the Guaranty;

(v)  the Aircraft is being used primarily for business purposes and the Loan is not credit offered or extended to a consumer primarily for personal, family, or household purposes as contemplated in 12 C.F.R. 226.2(a)(12). In making these representations, Borrower acknowledges that were the Loan to be for consumer credit

purposes, Borrower would be entitled to certain disclosures and protections under various state and federal consumer protection statutes;

(w) there is currently no accessory, device or equipment installed or located on the Aircraft which is a "defense article" (as such term is defined under the Arms Export Control Act or the International Traffic in Arms Regulation) and the Aircraft is not a "defense article" (as such term is defined under the Arms Export Control Act or the International Traffic in Arms Regulation);

(x) Borrower is in full compliance with all laws and regulations applicable to it including, without limitation, (i) ensuring that no Person who owns a controlling interest in or otherwise controls Borrower is or shall be (x) listed on the Specially Designated Nationals and Blocked Person List maintained by the Office of Foreign Assets Control ("OFAC"), Department of the Treasury, and/or any other similar lists maintained by OFAC pursuant to any authorizing statute, Executive Order or regulation or (y) a Person designated under Section 1(b), (c) or (d) of Executive Order No. 13224 (September 23, 2001), any related enabling legislation or any other similar Executive Orders, and (ii) compliance with all applicable Bank Secrecy Act ("BSA") laws, regulations and government guidance on BSA compliance and on the prevention and detection of money laundering violations; and

(y) Borrower is solvent and will not be rendered insolvent by this Agreement or the transactions contemplated hereby and, after giving effect to such transactions, Borrower will not be left with an unreasonably small amount of capital with which to engage in its business, nor does Borrower intend to incur, or believe that it has incurred, debts beyond his ability to pay as they mature. Borrower is not entering into the transactions contemplated by this Agreement with any intent to hinder, delay or defraud any of Borrower's creditors.

(z) as of the Closing Date, the aircraft has less than 500 total flight hours.

Section 4.  Covenants.  Borrower covenants and agrees that from and after the Closing Date and so long as any of the Obligations are outstanding:

4.1  Notices; Financial Information; and Further Assurances.  Borrower will, at its sole expense:

(a) promptly give written notice to Lender of (i) the occurrence of any Default or Event of Default; (ii) the occurrence of any Event of Loss with respect to the Aircraft; (iii) the commencement or threat of any Proceeding; (iv) any change in Borrower's presently existing state organizational identification number or of the issuance of a state organizational identification number if Borrower currently has no such state organizational number but is subsequently issued such a number; (v) any Material Damage with respect to the Aircraft concurrently with Borrower's report of same to the applicable governmental authority, and if no such report is required, within ten (10) days of the occurrence of such Material Damage, together with any damage reports provided to the FAA or any other governmental authority, the insurers or supplier of the Aircraft, and any documents pertaining to the repair of such damage, including copies of work orders, and all invoices for related charges; (vi) any Lien that attaches to the Aircraft and the full particulars of the Lien, within ten (10) days after Borrower becomes aware of such Lien; (vii) any change of the primary hangar location from that set forth in Annex D hereto, at least ten (10) days prior to any such change; (viii) any accident involving the Aircraft causing bodily injury or property damage to third parties, within five (5) days of such accident; (ix) the renewal or replacement of the insurance coverage required by this Agreement with respect to the Aircraft, at least ten (10) days prior to the policy expiration date for such insurance; (x) any change in the appearance or coloring of the Aircraft; and (xi) any change in Borrower's presently existing legal name, state of organization or incorporation, mailing, chief executive office and/or principal place of business address, at least thirty (30) days' prior to any such change.

(b) furnish (or cause to be furnished) to Lender (i) as soon as available, but in any event not later than May 31st of each calendar year, Borrower's consolidating balance sheet as at the end of such fiscal year, statements of income, retained earnings and changes in financial position of Borrower for such fiscal year, all in reasonable detail, and (ii) promptly, such additional financial and other information as Lender may from time to time reasonably request; and

(c) promptly execute and deliver, and/or cause Guarantor to execute and deliver to Lender such further instruments, UCC, FAA and other documents, initiate and/or consent to registrations and discharges (and

take all related actions so as to cause the same to be done) and take such further action, as Lender may from time to time reasonably request in order to further carry out the intent and purpose of this Agreement and to establish and protect, perfect and/or give first priority to, the rights, interests and remedies created, or intended to be created, in favor of Lender hereby. Borrower hereby irrevocably authorizes Lender and any employee, officer or agent thereof, in such jurisdictions where such action is authorized by law, to effect any such recordation or filing without the signature of Borrower thereto.

    (d)    Borrower will maintain a minimum net income of at least $1.00, which shall be tested annually.

    (e)    Any indebtedness now owing or that hereafter may become owing from Borrower to any Affiliate of Borrower, shall at all times and in all respects be expressly subordinate and junior in right of payment to any and all indebtedness and other obligations of Borrower to Lender, however payments may be made there under except during the continuance of any Event of Default hereunder.

    (f)    The Aircraft will not be operated in excess of 500 hours annually.

    4.2    General Obligations.  Borrower shall: (a) duly observe and conform to all requirements of Applicable Law relating to the conduct of its business, the Aircraft and to its properties or assets; (b) obtain and keep in full force and effect all rights, franchises, licenses and permits that are necessary to the proper conduct of its business; (c) remain a "citizen of the United States" within the meaning of the Transportation Code; (d) obtain or cause to be obtained as promptly as possible any governmental, administrative or agency approval and make, or cause to be made, any filing or registration therewith (including, without limitation, with the FAA and the International Registry) required with respect to the performance of its obligations under this Agreement and the other Loan Documents and the operation of the Aircraft and Borrower's business; (e) cause the Aircraft to remain duly registered, in its name, under the Transportation Code; (f) maintain all Records to be maintained with respect to the Aircraft; (g) pay and perform all of its obligations and liabilities when due; (h) keep proper books of records and accounts in which full, true and correct entries will be made of all dealings or transactions in relation to its business and activities; (i) not file or record any corrective or termination statements, UCC financing statements, amendments or assignments or control agreements filed or recorded by or for the benefit of Lender with respect to any of the Collateral, and shall not discharge or allow to be discharged any international interest or other Registerable Interest created in favor of Lender without Lender's prior written consent; and (j) promptly cause any Lien that is not a Permitted Lien that is registered with the International Registry to be discharged. Borrower will pay, or reimburse Lender for, any and all fees, taxes, insurance premiums, costs and expenses of whatever kind or nature incurred in connection with the creation, preservation and protection of the Collateral and the perfection and first priority of the Lender's Lien therein.

    4.3    Taxes.  Borrower will file with all appropriate taxing authorities all Federal, state and local income tax returns that are required to be filed and all registrations, declarations, returns and other documentation with respect to any personal property taxes (or any other taxes in the nature of or imposed in lieu of property taxes) due or to become due with respect to the Aircraft. Borrower will (i) pay on or before the date when due all taxes as shown on said returns and all taxes assessed, billed or otherwise payable with respect to the Aircraft directly to the appropriate taxing authorities; and (ii) pay when due all license and/or registration or filing fees, assessments, governmental charges and sales, use, property, excise, privilege, value added and other taxes (including any related interest or penalties) or other charges or fees now or hereafter imposed by any governmental body or agency upon Borrower, the Aircraft or any other property of Borrower or with respect to the landing, airport use, manufacturing, ordering, shipment, purchase, ownership, delivery, installation, leasing, chartering, operation, possession, use or other disposition of the Aircraft (the items referred to in (i) and (ii) above being referred to herein collectively, as "Impositions").

    4.4    No Disposition of Collateral or Liens; Title and Security Interest.  Except as expressly permitted below, Borrower shall not sell, assign, charter, lease, timeshare, pool, interchange, convey, mortgage, exchange or otherwise transfer or relinquish possession of or dispose of the Aircraft, any part thereof or any of the other Collateral or attempt or offer to do any of the foregoing. In addition, Borrower shall not relinquish possession of the Airframe, any APU, Engine or Part or install any APU, Engine or Part, or permit any APU, any Engine or Part to be installed, on any airframe other than the Airframe to which it relates, except as expressly permitted herein. The foregoing shall not be deemed to prohibit the delivery of possession of the Aircraft, any APU, Engine or Part to

another Person for testing, service, repair, maintenance, overhaul or, to the extent permitted hereby, for alteration or modification. Borrower will not create, assume or suffer to exist any Liens on or with respect to the Aircraft, any APU, Engine, Part or any of the other Collateral, or Borrower's interest therein other than Permitted Liens. Borrower will promptly take such action as directed by Lender to duly discharge any such Lien. If Borrower fails to remove a Lien, Lender may take such action as it deems appropriate to remove such Lien, but without waiving its other rights hereunder. Borrower will warrant and defend its good and marketable title to the Aircraft free and clear of Liens other than Permitted Liens, and the perfection and first priority of the Lender's Lien in the Collateral, against all claims and demands whatsoever.

Notwithstanding the foregoing, provided that no Default or Event of Default has occurred and is continuing, Borrower may lease the Aircraft to Lessee pursuant to the Lease specified in the Consent to Lease, subject to the satisfaction of the following conditions: (i) Lessee (A) is and remains a solvent, domestic company, (B) is a Transacting User Entity, (C) has appointed a Professional User Entity satisfactory to Lender, and (D) identifies its Administrator to Lender; and (ii) the Lease (A) is a true lease and not a grant of a "security interest" as such term is used in Section 1-201 (37) of the UCC, and expressly, and at all times shall remain, subject and subordinate to this Agreement and the rights of Lender hereunder and in and to the Aircraft, (B) does not permit any further leasing or other disposition, (C) does not permit any de-registration of the Aircraft from the FAA registry or registration of the Aircraft in the registry of the aviation authority or other governmental authority of any other nation, (D) does not contain provisions that are inconsistent with the provisions of this Agreement or cause Borrower to breach any of its representations, warranties or agreements under this Agreement, and (E) otherwise conforms to the Consent to Lease. The terms and conditions of the Consent to Lease are hereby incorporated herein by their reference. No such leasing by Borrower will reduce any of the obligations of Borrower hereunder or the rights of Lender hereunder, and all of the obligations of Borrower hereunder shall be and remain primary and shall continue in full force and effect as the obligations of a principal and not of a guarantor or surety.

4.5   Use of Aircraft; Maintenance; Excess Use; Modifications; Loaner Engines; Identification; Security. With respect to the Aircraft, Borrower agrees that:

(a)   Borrower will operate the Aircraft under and in compliance with Part 91 and any other applicable provision of the FARs, for purposes that are incidental to Borrower's business, and in a manner that is consistent with the transactions hereunder being deemed commercial (and not consumer) transactions under Applicable Law. Borrower shall not operate or permit the Aircraft to be operated for air taxi operations or otherwise under Part 135 of the FARs. The Aircraft shall be used solely in a passenger configuration for which Borrower is duly authorized by the FAA. Borrower will not operate or permit the Aircraft to be operated in any manner, at any time or in any geographic area when or where the insurance required hereunder shall not be in effect or Borrower shall be in breach thereof. Unless otherwise expressly permitted by Section 4.4 hereof, Borrower shall retain operational control of the Aircraft at all times and base the Aircraft at the primary hangar location set forth in Annex D hereto. The Aircraft at all times will be operated by duly qualified pilots having satisfied all requirements established and specified by the FAA, the Transportation Security Administration, any other applicable governmental authority and the insurance policies required under this Agreement.

(b)   Borrower will operate the Aircraft in a careful and proper manner in compliance with all Applicable Standards, including, without limitation, its operation, maintenance and security. The Aircraft shall not be operated, used or located outside the continental United States, except that it may be flown temporarily to any country in the world for any purpose expressly permitted under this Agreement. Notwithstanding the foregoing, the Aircraft shall not be flown, operated, used or located in, to or over any such country or area (temporarily or otherwise), (i) that is excluded from the insurance required hereunder (or not specifically covered by such insurance), (ii) with which the U.S. does not maintain favorable diplomatic relations, (iii) in any area of recognized or threatened hostilities, or (iv) in violation of this Agreement or any Applicable Standards, including any U.S. law or United Nations Security Council Directive, or (v) to the extent that payment of any claim under the insurance required hereunder directly or indirectly arising or resulting from or connected with any such flight, operation, use or location would be prohibited under any trade or other economic sanction or embargo by the United States of America. Borrower shall implement all security measures required by any governmental authority, or by any insurance policies or that are necessary or appropriate for the proper protection of the Aircraft (whether on the ground or in flight) against theft, vandalism, hijacking, destruction, bombing, terrorism or similar acts.

(c)     Borrower will, at its own expense, (i) maintain, inspect, service, repair, overhaul and test the Airframe, each Engine, any APU and each Part in accordance with Applicable Standards; (ii) make any alteration or modification to the Aircraft that may at any time be required to comply with Applicable Standards, to cause the Aircraft to remain airworthy or to maintain the Aircraft's airworthiness certification; (iii) furnish all parts, replacements, mechanisms, devices and servicing required therefor so that the condition and operating efficiency of the Airframe, Engine, APU or Part will at all times be no less than its condition and operating efficiency as and when delivered to Borrower, ordinary wear and tear from proper use alone excepted; (iv) promptly replace all Parts that become worn out, lost, stolen, taken, destroyed, damaged beyond repair or permanently rendered or declared unfit for use for any reason whatsoever; and (v) maintain (in English) all Records in accordance with Applicable Standards. All repairs, parts, replacements, mechanisms and devices so furnished shall immediately, without further act, become part of the Aircraft and subject to the security interest created by this Agreement. All maintenance procedures shall be performed by properly trained, licensed, and certified maintenance sources and maintenance personnel utilizing replacement parts approved by the FAA and the manufacturer of the applicable Airframe, Engine, APU or Part. Without limiting the foregoing, Borrower shall comply with all mandatory service bulletins and airworthiness directives by causing compliance to such bulletins and/or directives to be completed through corrective modification in lieu of operating manual restrictions.

(d)     Borrower will not make or authorize any improvement, change, addition or alteration to the Aircraft that will impair the originally intended function or use of the Aircraft, diminish the value of the Aircraft as it existed immediately prior thereto, or violate any Applicable Standard; and any Part, mechanism, device or replacement added to the Aircraft in connection therewith shall immediately, without further act, become part of the Aircraft and subject to the security interest created by this Agreement.

(e)     Borrower shall prominently display on the Aircraft the FAA Registration number specified in Annex C attached hereto. If requested by Lender in writing, Borrower shall, at its expense, attach to the Aircraft a notice satisfactory to Lender disclosing Lender's security interest in the Aircraft.

(f)     In the event any Engine is damaged, being inspected, repaired or overhauled, Borrower, at its option, may temporarily substitute another engine of the same make and model as the Engine being repaired or overhauled (any such substitute engine being hereinafter referred to as a "Loaner Engine") during the period of such repair or overhaul; provided no Event of Default or Default has occurred and is continuing and (i) installation of the Loaner Engine is performed by a maintenance facility certified by the FAA and manufacturer with respect to an aircraft of this type, (ii) the Loaner Engine is removed and the repaired or overhauled original Engine is reinstalled on the Airframe promptly upon completion of the repair or overhaul but in no event later than the earlier of ninety (90) days after removal or the occurrence of an Event of Default, and (iii) the Loaner Engine is free and clear of any Lien that might impair Lender's rights or interests in the Aircraft and is maintained in accordance herewith.

(g)     Borrower shall implement all security measures and systems necessary or appropriate for the proper protection of the Aircraft (whether on the ground or in flight) against theft, vandalism, hijacking, destruction, bombing, terrorism or similar acts. Upon Lender's request (but without Lender having any obligation with respect to Borrower's compliance with the provisions of this Section 4.5(g)), Borrower shall provide Lender with evidence of Borrower's compliance with its obligations under this Section 4.5(g).

4.6     Insurance.

(a)     Borrower agrees to maintain at all times, at its sole cost and expense, with insurers of recognized reputation and responsibility satisfactory to Lender (but in no event having an A.M. Best or comparable agency rating of less than "A-"):

(i)     insurance of the type and amounts set forth in Annex B hereto;

(ii)     (A) "all-risk" ground, taxiing, and flight hull insurance on an agreed-value basis, covering the Aircraft, provided that such insurance shall at all times be in an amount not less than the greater of (1) the full replacement value of the Aircraft (as determined by Lender), or (2) the unpaid principal amount of the Note (each such amount re-determined as of each anniversary of the Closing Date for the next succeeding year until the Lender's Lien relating to the Aircraft has been released by Lender pursuant to this Agreement); and

(iii)  war risk and allied perils (including confiscation, appropriation, expropriation, terrorism and hijacking insurance) in the amounts required in paragraphs (i) and (ii), as applicable.

(b)  Any policies of insurance carried in accordance with this Section 4.6 and any policies taken out in substitution or replacement of any such policies shall (i) be endorsed to name Lender as an additional insured as its interests may appear (but without responsibility for premiums), (ii) provide, with respect to insurance carried in accordance with Section 4.6(a)(ii) or (a)(iii) above, that any amount payable thereunder shall be paid directly to Lender as sole loss payee and not to Lender and Borrower jointly, (iii) provide for thirty (30) days' (seven (7) days' in the case of war, hijacking and allied perils) prior written notice by such insurer of cancellation, material change, or non-renewal, (iv) include a severability of interest clause providing that such policy shall operate in the same manner as if there were a separate policy covering each insured, (v) waive any right of set-off against Borrower or Lender, and any rights of subrogation against Lender, (vi) provide that in respect of the interests of Lender in such policies, that the insurance shall not be invalidated by any action or inaction of Borrower or any other Person operating or in possession of the Aircraft, regardless of any breach or violation of any warranties, declarations or conditions contained in such policies by or binding upon Borrower or any other Person operating or in possession of the Aircraft, and (vii) be primary, not subject to any co-insurance clause and shall be without right of contribution from any other insurance. Notwithstanding clause (ii) of the preceding sentence, so long as no Default has occurred and is continuing, and no Default, Event of Default or Event of Loss with respect to the Aircraft has occurred, any amount payable to Lender pursuant to clause (ii) above shall be paid if (A) $100,000.00, or more, in the aggregate, to Lender and Borrower, jointly, as their interests may appear, and released by Lender to Borrower or other appropriate Persons in payment of the costs actually incurred with respect to repairs made to the Aircraft so as to restore it to the operating condition required by this Agreement, or shall be disbursed by Lender as otherwise required by this Agreement, or (B) less than $100,000.00 in the aggregate, to Borrower (and such amounts shall be applied by Borrower to pay the costs of such repairs).

(c)  All of the coverages required herein shall be in full force and effect worldwide throughout any geographical areas to, in or over which the Aircraft is operated.  Borrower shall not self-insure (by deductible, premium adjustment, or risk retention arrangement of any kind) the insurance required to be maintained hereunder. All insurance proceeds payable under the requisite policies shall be payable in U.S. Dollars.  Borrower agrees that it shall obtain and maintain such other insurance coverages, or cause adjustments to be made to the scope, amount or other aspects of the existing insurance coverages, promptly upon Lender's request, as and when Lender deems such additional insurance coverages or modifications to be appropriate in light of any changes in Applicable Standards, the insurance market, Borrower's anticipated use of the Aircraft or other pertinent circumstances.

(d)  Annually on or before the anniversary of the Closing Date, Borrower shall furnish to Lender an insurance certificate in form and substance satisfactory to Lender evidencing that Borrower has obtained the insurance coverages required herein for a twelve (12) month or greater period commencing from and after such anniversary date, and, if Lender shall so request, a copy of the applicable policies.  In the event Borrower shall fail to maintain insurance as herein provided, Lender may, at its option, provide such insurance, and Borrower shall, upon demand, reimburse Lender for the cost thereof, together with interest at the default rate of interest provided for in the Note from the date of payment through the date of reimbursement.

4.7  Event of Loss.

(a)  Upon the occurrence of any Event of Loss with respect to the Airframe and/or the Aircraft, Borrower shall notify Lender of any such Event of Loss within five (5) days of the date thereof.  Borrower shall pay, within thirty (30) days after the occurrence of such Event of Loss, the following amounts: (i) the unpaid principal amount of the Note, (ii) interest accrued thereon to the date of prepayment, and any and all other amounts then due hereunder or under the other Loan Documents.

(b)  Upon an Event of Loss with respect to any Engine or APU under circumstances in which there has not occurred an Event of Loss with respect to the Airframe, Borrower shall, within thirty (30) days after the occurrence of such Event of Loss, replace such Engine or APU, as applicable, and grant to Lender a first priority security interest in a similar or better engine or auxiliary power unit, as applicable.  Such engine or auxiliary power unit, as applicable, shall be of the same make and model number as the Engine or APU suffering the Event of Loss

and shall be free and clear of all Liens and shall have a value, utility and useful life at least equal to, and be in as good an operating condition as, the Engine or APU suffering the Event of Loss, assuming such Engine or APU was in the condition and repair required by the terms hereof immediately prior to the occurrence of such Event of Loss. Borrower, at its own cost and expense, shall furnish Lender with such documents to evidence such conveyance and make such filings as Lender shall request to subject such engine or auxiliary power unit, as applicable, to the Lender's Lien. Each such replacement engine or auxiliary power unit, as applicable, shall, after such conveyance be deemed an "Engine" or "APU" (as defined herein), as applicable, and shall be deemed part of the same Aircraft as was the Engine or APU replaced thereby.

(c)     Lender shall be entitled to receive and retain all proceeds payable by any insurer with respect to an Event of Loss, by any manufacturer with respect to a return to manufacturer or by any governmental authority with respect to any requisition of use, as the case may be; provided, however, that so long as no Default or Event of Default shall have occurred and be continuing and Borrower has complied with the provisions of this Section 4.7, then Lender shall remit such proceeds to Borrower.

(d)     If the Airframe, any Engine, APU or major Part has suffered any damage requiring the FAA to be notified of such damage by use of an FAA Form 337 or otherwise, then within ten (10) days of such notification to the FAA, Borrower shall notify Lender of such damage, and Lender and Borrower shall consult for the purpose of determining the diminished value of the Aircraft resulting from such damage history. The diminished value of the Aircraft shall be the amount by which the fair market sales value of the Aircraft without such damage history exceeds the fair market sales value of the Aircraft with such damage history. For purposes hereof, fair market sales value shall be determined on the following basis: (i) the value shall be the amount which would be obtained in an arm's length transaction between an informed and willing buyer (who is not a used aircraft dealer), and an informed and willing seller under no compulsion to sell; (ii) the costs of removal of the Aircraft from its then location shall not be a deduction from such value; and (iii) in determining any such value, it shall be assumed (whether or not the same be true) that the Aircraft has been maintained by Borrower and is in the condition in which it is required to be in accordance with this Agreement.

Within ten (10) days after Borrower and Lender agree upon the diminished value of the Aircraft, Borrower shall pay Lender the amount of such diminished value, which payment Lender shall apply as a partial prepayment of the Note without any prepayment penalty. If Borrower and Lender cannot agree on the diminished value of the Aircraft within ten (10) days after notification of such damage to the FAA, then Lender shall appoint an independent appraiser (reasonably acceptable to Borrower) to determine such value. Borrower agrees to pay the costs and expenses of any such determination and appraisal. The independent appraiser shall be required to complete such determination as promptly as practicable, but in any event, not later than forty (40) days after the date on which it is appointed. A final determination by the independent appraiser regarding the extent of any diminished value of the Aircraft shall be binding on Borrower and Lender. Within ten (10) days after the independent appraiser's determination of the diminished value of the Aircraft, Borrower shall pay Lender the amount of such diminished value, which payment Lender shall apply as a partial prepayment of the Note without any prepayment penalty.

Section 5.     Security Interest; Power of Attorney; Inspection.

5.1     Grant of Security Interest. As collateral security for the prompt and complete payment and performance as and when due of all of the Obligations and in order to induce Lender to enter into this Agreement and make the Loan to Borrower in accordance with the terms hereof, Borrower hereby grants to Lender a first priority security interest in and lien in, against, under and with respect to (the "Lender's Lien"), all of Borrower's right, title and interest in, to and under all of the following collateral (collectively, the "Collateral"): (i) the Aircraft, (ii) the Airframe, (iii) each of the Engines, (iv) the APU, (v) the Parts, (vi) the Records; (vii) all present and future Third Party Agreements; (viii) any and all associated rights; and (ix) all proceeds of the foregoing. The foregoing shall not be deemed in any way whatsoever as an agreement by Lender to permit or allow Borrower to enter into any Third Party Agreements, and Borrower shall be allowed to enter into any of the foregoing only in accordance with terms of this Agreement. Notwithstanding anything to the contrary contained herewith or otherwise, Lender does not by virtue of this Agreement or otherwise assume any obligations, liabilities and/or duties of any kind whatsoever of Borrower (and/or of any other Person) under, or with respect to, the Collateral, and Lender shall not be responsible in any way whatsoever for the performance of any obligations, liabilities and/or duties of any kind whatsoever by Borrower (and/or by any other Person) in connection with, relating to, or arising under, the

Collateral. By way of clarification and not limitation, the foregoing grant of the Lender's Lien shall include, as applicable (and in each case, being validly registered and having first priority), (A) an international interest in the Airframe, at all times and without regard as to whether the Engines are installed as an accessory of the Airframe, (B) an international interest in each Engine, at all times (1) prior to its installation on the Airframe, and (2) after removal from and before re-installation on the Airframe, and (C) a prospective international interest in each Engine at all times while installed on the Airframe (which prospective interest, immediately upon the removal of such Engine, shall become an international interest, and be treated as registered as from the time of its registration as a prospective international interest).

5.2 <u>Lender Appointed as Attorney-in-Fact</u>. Borrower hereby irrevocably constitutes and appoints Lender and any employee, officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full power and authority in the place and stead of Borrower and in the name of Borrower or in its own name, from time to time in Lender's sole discretion, for the purpose of carrying out the terms of this Agreement, and Borrower hereby further irrevocably authorizes Lender and any employee, officer or agent thereof to take any and all appropriate action and to make, execute, deliver, file, record, register and/or discharge any and all instruments, documents, filings or registrations (including, without limitation, any FAA filings, Cape Town Convention registrations, UCC financing statements or UCC amendments or any control agreements) that may be necessary or desirable to accomplish the purposes of this Agreement or any of the other Loan Documents. This appointment is coupled with an interest, is irrevocable and shall terminate only upon indefeasible payment and performance in full of all of the Obligations. The powers conferred on Lender hereunder are solely to protect its interest in the Collateral and shall not impose any duty upon it to exercise any such powers. Lender shall be accountable only for amounts that it actually receives as a result of the exercise of such powers and neither it nor any of its officers, directors, employees or agents shall be responsible to Borrower for any act or failure to act.

5.3 <u>Consent to Registration of International Interest</u>. Borrower hereby consents to the registration of any international interest arising in connection with this Agreement and/or any Loan Document in favor of Lender and hereby authorizes its professional user entity to consent to the registration (including all final consents thereto) of any international interest with the International Registry upon request therefor by Lender.

5.4 <u>Inspection</u>. Lender or its authorized representatives shall have the right, but not the duty, to inspect the Aircraft, any part thereof and/or the Records, at any reasonable time and from time to time, wherever located, upon reasonable prior written notice to Borrower; except that no advance notice shall be necessary prior to any inspection conducted, and such inspection may be conducted at any time, after the occurrence of a Default or an Event of Default. Upon request of Lender, Borrower shall promptly provide Lender with notice of the location of the Aircraft and with all Records. Borrower shall be responsible for the cost of any inspection conducted after the occurrence of a Default or an Event of Default and shall pay Lender such amount promptly upon demand.

Section 6. <u>Events of Default</u>. The term "Event of Default", wherever used herein, shall mean any of the following events or circumstances (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary, or come about or be effected by operation of law, or be pursuant to or in compliance with any judgment, decree or order of any court or any order, rule or regulation or any administrative or governmental body):

(a) Borrower shall fail to pay any Obligation within ten (10) days after the same shall become due and payable (whether at the stated maturity, by acceleration, upon demand or otherwise); or

(b) Borrower or Guarantor shall default in the payment or performance of any indebtedness, liability or obligation to Lender or any Affiliate of Lender under any note, security agreement, lease, title retention or conditional sales agreement or any other instrument or agreement; or

(c) Borrower or Guarantor shall be in default in any payment or other obligation to any Person other than Lender or its Affiliates and (i) the amount which is in excess of $500,000.00, and (ii) any applicable grace period with respect thereto has expired and (iii) the Person to which such payment or obligation is owed has accelerated all payment obligations with respect thereto; or

(d)     Borrower shall fail to keep in full force and effect any of the insurance coverages required under this Agreement, or shall operate the Aircraft at a time when, or at a place in which, such insurance shall not be in effect; or

(e)     Borrower shall fail to maintain, use or operate the Aircraft in compliance with this Agreement, including but not limited to Section 4.5(c); or

(f)     Borrower shall (except as expressly permitted by the provisions of this Agreement) sell, assign, charter, lease, timeshare, pool, interchange, convey, mortgage, exchange or otherwise transfer or relinquish possession of or dispose of, or create, assume or suffer to exist any Liens (other than Permitted Liens) on or with respect to, the Aircraft, any part thereof or any of the other Collateral, or Borrower's interest therein, or attempt or offer to do any of the foregoing, or permit the same to occur; or

(g)     Borrower shall fail to perform or observe any agreement (other than those specifically referred to in this Section 6) required to be performed or observed by it under this Agreement or in any of the other Loan Documents, and such failure shall continue uncured for thirty (30) days after written notice thereof from Lender to Borrower (but such notice and cure period will not be applicable unless such breach is curable by practical means within such notice period); or

(h)     any representation or warranty made by Borrower or Guarantor in this Agreement or in any of the other Loan Documents or in any agreement, document or certificate delivered by Borrower or Guarantor in connection herewith or pursuant hereto shall prove to have been incorrect, misleading, or inaccurate in any material respect when such representation or warranty was made or given (or, if a continuing representation or warranty, at any time); or

(i)     Borrower or Guarantor shall (i) generally fail to pay its debts as they become due, admit its inability to pay its debts or obligations generally as they fall due, or shall file a voluntary petition in bankruptcy or a voluntary petition or an answer seeking reorganization in a proceeding under any bankruptcy laws or other insolvency laws, or an answer admitting the material allegations of such a petition filed against Borrower or Guarantor in any such proceeding; or (ii) by voluntary petition, answer or consent, seek relief under the provisions of any other bankruptcy or other insolvency or similar law providing for the reorganization or liquidation of corporations, or providing for an assignment for the benefit of creditors, or providing for an agreement, composition, extension or adjustment with its creditors; or

(j)     a petition against Borrower or Guarantor in a proceeding under applicable bankruptcy laws or other insolvency laws, as now or hereafter in effect, shall be filed and shall not be withdrawn or dismissed within sixty (60) days thereafter, or if, under the provisions of any law providing for reorganization or liquidation of corporations that may apply to Borrower or Guarantor, any court of competent jurisdiction shall assume jurisdiction, custody or control of Borrower or Guarantor or of any substantial part of its property and such jurisdiction, custody or control shall remain in force unrelinquished, unstayed or unterminated for a period of sixty (60) days; or

(k)     any judgment, attachment or garnishment against Borrower or Guarantor with respect to aggregate claims in excess of $250,000 shall remain unpaid, unstayed on appeal, undischarged, unbonded or undismissed for a period of thirty (30) days; or

(l)     the occurrence of any of the following events: (A) Borrower enters into any transaction of merger, consolidation or reorganization; (B) Borrower ceases to do business as a going concern, liquidates, dissolves or sells, transfers or otherwise disposes of all or substantially all of its assets or property; (C) Borrower becomes the subject of, or engages in, a leveraged buy-out; (D) Borrower changes the form of organization of its business; (E) if Borrower is privately owned as of the Closing Date, there is any substantial change in the ownership or control of the capital stock or membership interests of Borrower such that the holder(s) that own or control fifty percent (50%) or more of such equity interests as of the Closing Date no longer do so; or (F) if Borrower is publicly held as of the Closing Date, any change so that Borrower is no longer subject to the reporting requirements of the Securities Exchange Act of 1934, as amended, or no longer registered under Section 12 of the Securities Act of 1933, as amended; or

(m)    there is a material adverse change in the business, operations or financial condition of Borrower or of Guarantor or in its ability to comply with the Loan Documents since the Closing Date as determined by Lender, in its sole discretion and in good faith; or

(n)    any event or condition set forth in subsections (b) through (m) of this Section 6 shall occur with respect to Lessee or Guarantor or any other person responsible, in whole or in part, for payment or performance of this Agreement or any other Loan Document or

(o)    the death or judicial declaration of incompetence of Guarantor or any other individual responsible, in whole or in part, for payment or performance of the Obligations, any repudiation by Guarantor of Guarantor's obligation for the payment or performance of the Obligations or any allegation or determination that the Guaranty is unenforceable in any material respect.

Section 7.    Remedies.

7.1    Acceleration.  If an Event of Default specified in Sections 6 (i) or (j) above shall occur, then, and in any such event, the Obligations (including, without limitation, the unpaid principal amount of the Note, together with all accrued but unpaid interest thereon, any Prepayment Fees and all other amounts due and payable under or with respect to the Loan Documents) shall become immediately due and payable without any notice or other action by Lender.  If any other Event of Default shall occur, then, and in any such event, Lender, in its sole discretion, may declare the Obligations to be forthwith due and payable, whereupon the Obligations (including, without limitation, the unpaid principal amount of the Note, together with all accrued but unpaid interest thereon, any Prepayment Fees and all other amounts due and payable under or with respect to the Loan Documents), shall become immediately due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived, anything contained herein or in the other Loan Documents to the contrary notwithstanding.  During the continuance of any Event of Default hereunder, Lender shall have the right to pursue and enforce any of its rights and remedies under this Section 7.

7.2    Additional Remedies.  If an Event of Default occurs, in addition to all other rights and remedies granted to it in this Agreement and in the other Loan Documents, Lender may exercise all rights and remedies (including interim remedies) of a secured party under the UCC, a creditor under the Cape Town Convention or under any other Applicable Law.  Without limiting the generality of the foregoing, Borrower agrees that upon the occurrence of an Event of Default, Lender, without demand or notice of any kind (except the notice specified below of time and place of public or private sale) to or upon Borrower or any other Person (all and each of which demands and/or notices are hereby expressly waived), in its sole discretion, may exercise any one or more of the following remedies: (i) proceed at law or in equity, to enforce specifically Borrower's performance or to recover damages; (ii) terminate the right of any third party to use of the Aircraft; (iii) enter the premises where the Aircraft is located and take immediate possession of and remove (or disable in place) the Aircraft (and/or the APU, any Engines and Parts then unattached to the Aircraft) by self-help, summary proceedings or otherwise without liability; (iv) use Borrower's premises for storage for up to sixty (60) days without liability; (v) sell, lease, assign or otherwise dispose of the Aircraft (or any Engine, APU or Part) or any of the other Collateral, whether or not in Lender's possession, in one or more parcels, at public or private sale or sales, at such prices as Lender may deem best, or keep the Aircraft idle; (vi) apply any deposit, other cash collateral or any proceeds of any Collateral to reduce any amounts due to Lender; (vii) collect, receive, appropriate and realize upon the Collateral, or any part thereof; (viii) procure the de-registration and/or export of the Aircraft pursuant to the IDERA; and (ix) terminate the Lease, without regard as to the existence of any event of default thereunder and recover, or cause Borrower and Lessee to relinquish possession and return the Aircraft, including the Engines and Parts, pursuant to this Section 7, and/or exercise any and all other remedies under the Consent to Lease, or in Borrower's stead, to the extent provided for under, or otherwise available to Borrower in connection with the Lease.  Lender shall have the right upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale, or sales to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption in Borrower, which right or equity of redemption is hereby expressly released.  Borrower further agrees, at Lender's request, to assemble the Collateral, make it available to Lender in the designated hangar, whether at Borrower's premises or elsewhere.  Lender shall apply the net proceeds of any such realization (after deducting all reasonable costs and expenses of every kind incurred in connection therewith) to the payment in whole or in part of the Obligations, in such order and manner as Lender may elect, with Borrower remaining liable for any deficiency.

To the extent permitted by applicable law, Borrower waives all claims, damages and demands against Lender arising out of the repossession, retention, sale or other disposition of the Collateral. Borrower agrees that Lender need not give more than ten (10) days' notice (which notification shall be deemed given when mailed, postage prepaid, addressed to Borrower at its address set forth below its signature hereto) of the time and place of any public sale or of the time after which a private sale may take place and that such notice is reasonable notification of such matters. Borrower shall be liable for any deficiency if the proceeds of any sale or disposition of the Collateral are insufficient to pay all amounts to which Lender is entitled hereunder.

7.3   <u>No Waiver: Cumulative Remedies</u>.  No failure or delay on the part of Lender in exercising any right hereunder or under the Note or any of the other Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any right hereunder or thereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  No right or remedy in this Agreement or in any of the other Loan Documents is intended to be exclusive but each shall be cumulative and in addition to any other right or remedy hereunder or under the other Loan Documents or otherwise available to Lender at law or in equity, including, such rights and remedies as are provided for in the UCC and/or the Cape Town Convention.  The exercise by Lender of any one or more of such remedies shall not preclude the simultaneous or later exercise by Lender of any or all such other remedies.  No express or implied waiver by Lender of any Default or Event of Default shall in any way be, or be construed to be, a waiver of any future or subsequent Event of Default.  After the occurrence of any Default or Event of Default, the acceptance by Lender of any installment of principal and/or interest or of any other sum owing hereunder or under the other Loan Documents shall not constitute a waiver of such Default or Event of Default, regardless of Lender's knowledge or lack of knowledge thereof at the time of acceptance of any such payment and shall not constitute a reinstatement of this Agreement if Lender has sent Borrower a notice of default, unless Lender shall have agreed in writing to reinstate this Agreement and waive the Default or Event of Default.  To the extent permitted by Applicable Law, Borrower waives any rights now or hereafter conferred by statute or otherwise that limit or modify any of Lender's rights or remedies under this Agreement.

Section 8.   <u>Miscellaneous</u>.

8.1   <u>Notices</u>.  All communications and notices provided for herein shall be in writing and shall be deemed to have been duly given or made (i) upon hand delivery, or (ii) upon delivery by an overnight delivery service, or (iii) two (2) Business Days after being deposited in the U.S. mail, return receipt requested, first class postage prepaid, and addressed to Lender or Borrower at their respective addresses set forth under their signatures hereto or such other address as either party may hereafter designate by written notice to the other, or (iv) when sent by telecopy (with customary confirmation of receipt of such telecopy) on the Business Day when sent or upon the next Business Day if sent on other than a Business Day.

8.2   <u>Expenses and Fees; Indemnity; Performance of Borrower's Obligations</u>.

(a)   Borrower shall pay to Lender upon demand all fees, costs and expenses incurred by or on behalf of Lender at any time in connection with (i) the negotiation, preparation, execution, delivery and enforcement of this Agreement and the other Loan Documents and the collection of the Obligations, (ii) the creation, preservation and protection of the Collateral and the Lender's Lien (and first priority thereof, or (iii) the exercise of any right granted under, or any amendment or other modification to any of, the Loan Documents.  Such fees, costs and expenses shall include, without limitation, appraisal and inspection fees, the fees and expenses of Aviation Counsel and of Lender's counsel, consultants and brokers, UCC, FAA, Cape Town Convention, International Registry and other applicable title and lien searches, and costs and expenses relating to recovery, repossession, storage, insurance, transportation, repair, refurbishment, advertising, sale and other disposition of the Aircraft.  Borrower shall also pay all fees (including license, filing and registration fees), taxes, assessments and other charges of whatever kind or nature that may be payable or determined to be payable in connection with the execution, delivery, recording or performance of this Agreement or any of the other Loan Documents or any modification thereof.  In addition to the foregoing, Borrower shall pay to Lender a documentation fee in the amount of $500.00.

(b)   Borrower shall indemnify, protect, save, defend and keep harmless Lender, Lender's Affiliates and all of Lender's and such Affiliate's respective directors, shareholders, officers, employees, agents, predecessors, attorneys-in-fact, lawyers, successors and assigns (each an "Indemnitee") on a net after-tax basis, from and against

any and all liabilities, obligations, losses, damages, penalties, claims, actions, judgments, suits, demands, costs, expenses and disbursements (including, without limitation, legal fees and expenses) of any kind and nature whatsoever (collectively, "Claims") that may be imposed on, incurred by or asserted against any Indemnitee, whether or not such Indemnitee shall also be indemnified as to any such Claim by any other Person, in any way relating to, arising out of or in connection with (a) this Agreement or any of the other Loan Documents, including, without limitation, the execution, delivery, breach (including any Default or Event of Default), enforcement, performance or administration of this Agreement or any of the other Loan Documents, (b) the Collateral, including, without limitation, the perfection, maintenance, protection or realization upon the Collateral or any other security for the Obligations, or (c) without limiting the provisions of clause (b) above, the Aircraft, including the manufacture, inspection, construction, purchase, acceptance, rejection, ownership, management, pooling, interchange, chartering, titling or re-titling, delivery, lease, sublease, possession, use, operation, maintenance, condition, registration or re-registration, sale, removal, repossession, storage or other disposition of the Aircraft or any part thereof or any accident in connection therewith (including Claims involving or alleging environmental damage, criminal acts, hijacking, acts of terrorism or similar acts, product liability or strict or absolute liability in tort, latent and other defects (whether or not discoverable), for patent, trademark or copyright infringement). Notwithstanding the foregoing, Borrower shall not be required to indemnify an Indemnitee under this Section 8.2 for any Claim caused solely and directly by the gross negligence or willful misconduct of such Indemnitee. If any Claim is made against Borrower or any Indemnitee, the party receiving notice of such Claim shall promptly notify the other, but the failure of the party receiving notice to so notify the other shall not relieve Borrower of any obligation hereunder.

(c)     If Borrower fails to perform or comply with any of its agreements contained herein or in the other Loan Documents, including, without limitation, its obligations to keep the Aircraft free of Liens, comply with Applicable Standards, or obtain the requisite insurance coverages, Lender shall have the right, but shall not be obligated, to effect such performance or compliance, with such agreement. Any expenses of Lender incurred in connection with effecting such performance or compliance, together with interest thereon at the default rate of interest provided for in the Note from the date incurred until reimbursed, shall be payable by Borrower to Lender promptly on demand and until such payment shall constitute part of the Obligations secured hereby. Any such action shall not be a cure or waiver of any Default or Event of Default hereunder.

8.3     Entire Agreement; Modifications.  This Agreement and the other Loan Documents constitute the entire understanding and agreement of the parties hereto with respect to the matters contained herein and shall completely and fully supersede all other prior agreements (including any proposal letter, commitment letter, and/or term sheet), both written and oral, between Lender and Borrower relating to the Obligations. Neither Lender nor Borrower shall hereafter have any rights under such prior agreements but shall look solely to this Agreement and the other Loan Documents for the definition and determination of all of their respective rights, liabilities and responsibilities relating to the Obligations. Neither this Agreement, nor any terms hereof, may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against which enforcement of a change, waiver, discharge or termination is sought.

8.4     Construction of this Agreement and Related Matters.  All representations and warranties made in this Agreement and in the other Loan Documents shall survive the execution and delivery of this Agreement and the making of the Loan hereunder. Borrower's obligations contained in Section 8.2 hereof shall survive the payment and performance of the Obligations and the termination of this Agreement. This Agreement may be executed by the parties hereto on any number of separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument. The headings of the Sections hereof are for convenience only, are not part of this Agreement and shall not be deemed to affect the meaning or construction of any of the provisions hereof. Unless the context otherwise requires, singular nouns and pronouns, when used herein, shall be deemed to include the plural and vice versa, and impersonal pronouns shall be deemed to include the personal pronoun of the appropriate gender. Time is of the essence in the payment and performance of all of Borrower's obligations under this Agreement. Any provision of this Agreement that may be determined to be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective in such jurisdiction to the extent thereof without invalidating the remaining provisions of this Agreement, which shall remain in full force and effect.

8.5     Lender's Assignment.  Lender, may at any time, with or without notice to Borrower, grant a security interest in, sell, assign or otherwise transfer (an "Assignment") all or any part of its interest in this Agreement and

the other Loan Documents (along with any associated rights) or any amount due or to become due hereunder or thereunder, and Borrower shall perform all of its obligations under the Loan Documents, to the extent so transferred, for the benefit of the beneficiary of such Assignment (such beneficiary, including any successors and assigns, an "Assignee"). Borrower hereby waives any right to assert, and agrees not to assert, against any Assignee any abatement, reduction, defense, setoff, recoupment, claim or counterclaim that Borrower may have against Lender. Upon the express assumption by such Assignee of Lender's obligations hereunder, Lender shall be relieved of any such assumed obligations. Borrower hereby consents to any such assignment, grant, sale or transfer, including, without limitation, for purposes of the Cape Town Convention. If so directed in writing, Borrower shall pay all amounts due or to become due under the Loan Documents and/or any associated rights directly to the Assignee or any other party designated in writing by Lender. Borrower acknowledges and agrees that Lender's right to enter into an Assignment is essential to Lender and, accordingly, waives any restrictions under Applicable Law with respect to an Assignment and any related remedies. Upon the request of Lender or any Assignee, Borrower also agrees (a) to promptly execute and deliver to Lender or to such Assignee an acknowledgment of assignment in form and substance satisfactory to the requesting party, an insurance certificate naming Assignee as additional insured and loss payee and otherwise evidencing the insurance coverages required hereby, an International Registry filing (and any necessary consent thereto, as well as any renewal of any authorization required by the International Registry in connection with such filing, such as renewing its transacting user entity status and re-designating a professional user entity, if necessary in Lender's judgment), and such other documents and assurances reasonably requested by Lender or Assignee, and (b) to comply with the reasonable requirements of any such Assignee in order to perfect such Assignee's security interest and lien on the Collateral.

8.6 <u>Jurisdiction</u>. Borrower hereby irrevocably consents and agrees that any legal action, suit or proceeding arising out of or in any way in connection with this Agreement or any of the other Loan Documents may be instituted or brought in the courts of the State of New York or the United States District Court for the Southern District of New York, as Lender may elect or in any other state or Federal court as Lender shall deem appropriate, and by execution and delivery of this Agreement, Borrower hereby irrevocably accepts and submits to, for itself and in respect of its property, generally and unconditionally, the non-exclusive jurisdiction of any such court, and to all proceedings in such courts. Borrower irrevocably consents to service of any summons and/or legal process by first class, certified United States air mail, postage prepaid, to Borrower at the address set forth below their signatures hereto, such method of service to constitute, in every respect, sufficient and effective service of process in any such legal action or proceeding. Nothing in this Agreement or in any of the other Loan Documents shall affect the right to service of process in any other manner permitted by law or limit the right of Lender to bring actions, suits or proceedings in the courts of any other jurisdiction. Borrower further agrees that final judgment against it in any such legal action, suit or proceeding shall be conclusive and may be enforced in any other jurisdiction, within or outside the United States of America, by suit on the judgment, a certified or exemplified copy of which shall be conclusive evidence of the fact and the amount of the liability. Notwithstanding anything in the foregoing to the contrary, Lender and Borrower may bring a judicial proceeding against the Registrar of the International Registry in the Republic of Ireland, solely to the extent such proceeding seeks relief from the International Registry.

8.7 <u>Governing Law; Binding Effect</u>. This Agreement shall be construed and enforced in accordance with, and the rights of both parties shall be governed by, the internal laws of the State of New York (without regard to the conflict of laws principles of such state), including all matters of construction, validity, and performance. This Agreement shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns, except that Borrower may not assign or transfer its rights hereunder or any interest herein.

8.8 <u>Jury Waiver</u>. BORROWER HEREBY KNOWINGLY AND FREELY WAIVES ITS RIGHTS TO A JURY TRIAL IN ANY ACTION, SUIT OR PROCEEDING RELATING TO, ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE NOTE OR ANY OF THE OTHER LOAN DOCUMENTS.

[SIGNATURES ON NEXT PAGE]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the date first above written.

| | |
|---|---|
| Lender:<br>**RBS ASSET FINANCE, INC.** | Borrower:<br>**JUSTICE AVIATION, LLC** |
| By: _Janet Melancon_ | By:_____ |
| Name:_____Janet Melancon_____<br>_____Assistant Vice President_____<br>Title:_____ | Name:   James C. Justice, II<br><br>Title:   Member |
| Notice Address: | Notice Address: |
| 71 South Wacker Drive<br>Chicago, Illinois 60606<br>Attn:  Portfolio Manager<br>Telephone:  312-777-3550<br>Facsimile:  312-777-4002 | 106 Lockheed Drive<br>Beaver, West Virginia 25813<br>Attn:  Terry Miller<br>Telephone:  304-252-1074<br>Facsimile:  304-255-3973 |

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the date first above written.

Lender:
**RBS ASSET FINANCE, INC.**

By:_____

Name:_____

Title:_____

Notice Address:

71 South Wacker Drive
Chicago, Illinois 60606
Attn: Portfolio Manager
Telephone: 312-777-3550
Facsimile: 312-777-4002

Borrower:
**JUSTICE AVIATION, LLC**

By: _____

Name:   James C. Justice, II

Title:   Member

Notice Address:

106 Lockheed Drive
Beaver, West Virginia 25813
Attn: Terry Miller
Telephone: 304-252-1074
Facsimile: 304-255-3973

**DEFINITIONS**

The following terms shall have the following meanings for all purposes of this Agreement:

Certain of the terms used in the Agreement ("CTC Terms") have the meaning set forth in and/or intended by the "Cape Town Convention", which term means, collectively, (i) the official English language text of the Convention on International Interests in Mobile Equipment, adopted on 16 November 2001 at a diplomatic conference held in Cape Town, South Africa, as the same may be amended or modified from time to time (the "Convention"), (ii) the official English language text of the Protocol to the Convention on International Interests in Mobile Equipment on Matters Specific to Aircraft Equipment, adopted on 16 November 2001 at a diplomatic conference held in Cape Town, South Africa, as the same may be amended or modified from time to time (the "Protocol"), and (iii) the related procedures and regulations for the International Registry of Mobile Assets located in Dublin, Ireland and established pursuant to the Cape Town Convention, along with any successor registry (the "International Registry"), issued by the applicable supervisory authority pursuant to the Convention and the Aircraft Protocol, as the same may be amended or modified from time to time. By way of example, but not limitation, these CTC Terms include, "administrator", "associated rights", "contract of sale", "proceeds", "international interests", "prospective international interests", "security assignment", "transfer", "working days", "consent", "final consent", "priority search certificate", "professional user entity", "transacting user entity" and "contract"; except "proceeds" shall also have the meaning set forth below.

Affiliate shall mean, with respect to either Lender or Borrower, as applicable, any affiliated Person controlling, controlled by or under common control with such party, and for this purpose, 'control' means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of any such Person, whether through the legal or beneficial ownership of voting securities, by contract or otherwise.

Aircraft shall mean (i) the Airframe, (ii) the Engines, (iii) any APU, and (iv) the Records, and all accessories, additions, accessions, alterations, modifications, Parts, repairs and attachments now or hereafter affixed thereto or used in connection therewith, and all replacements, substitutions and exchanges (including trade-ins) for any of the foregoing.

Airframe shall mean (i) the Airframe described in Annex C hereto and shall not include the Engines or any APU, and (ii) any and all Parts from time to time incorporated in, installed on or attached to the Airframe and any and all Parts removed therefrom so long as Lender shall retain an interest therein in accordance with the applicable terms of this Agreement after removal from the Airframe.

Applicable Law shall mean all applicable laws, statutes, treaties, conventions, judgments, decrees, injunctions, writs and orders of any court, governmental agency or authority and rules, regulations, orders, directives, licenses and permits of any governmental body, instrumentality, agency or authority as amended and revised, and any judicial or administrative interpretation, of any of the same, including the airworthiness certificate issued with respect to the Aircraft, the Cape Town Convention, all FARs, airworthiness directives, and/or any of the same relating to noise, the environment, national security, public safety, exports or imports or contraband.

Applicable Standards shall mean (i) Applicable Law, (ii) the requirements of the insurance policies required hereunder, and (iii), with respect to the Airframe or any Engine, APU or Part, all compliance requirements set forth in or under (A) all maintenance manuals initially furnished with respect thereto, including any subsequent amendments or supplements to such manuals issued by the manufacturer or supplier thereof from time to time, (B) all mandatory service bulletins issued, supplied, or available by or through the applicable manufacturer with respect thereto, (C) all applicable airworthiness directives issued by the FAA or similar regulatory agency having jurisdictional authority, (D) all conditions to the enforcement of any warranties pertaining thereto, (E) Borrower's FAA approved maintenance program with respect to the Airframe, the Engines, any APU or Part.

APU shall mean (i) any auxiliary power unit described in Annex C hereto and installed on the Airframe as of the Closing Date, whether or not hereafter installed on the Airframe or any other airframe from time to time; (ii) any auxiliary power unit that may from time to time be substituted, pursuant to the applicable terms of this Agreement,

for an APU; and (iii) any and all Parts incorporated in or installed on or attached to such auxiliary power unit or any and all Parts removed therefrom so long as Lender shall retain an interest therein in accordance with the applicable terms of this Agreement after such removal.

Aviation Counsel shall mean such counsel as Lender may designate from time to time.

Business Day shall mean any day other than a Saturday, Sunday or other day on which banks located in Chicago, Illinois are closed or are authorized to close.

Collateral shall have the meaning set forth in Section 5.1 hereof.

Default shall mean an event or circumstance that, after the giving of notice or lapse of time, or both, would become an Event of Default.

Engine shall mean (i) each of the engines and described in Annex C hereto and installed on the Airframe as of the Closing Date, whether or not hereafter installed on the Airframe or any other airframe from time to time; (ii) any engine that may from time to time be substituted, pursuant to the applicable terms of this Agreement, for an Engine; and (iii) any and all Parts incorporated in or installed on or attached to such engine or any and all Parts removed therefrom so long as Lender shall retain an interest therein in accordance with the applicable terms of this Agreement after such removal.

Event of Default shall have the meaning set forth in Section 6 hereof.

Event of Loss with respect to the Aircraft, the Airframe, any Engine or any APU shall mean any of the following events: (i) loss of such property or the use thereof due to theft, disappearance, destruction, damage beyond repair or rendition of such property permanently unfit for normal use for any reason whatsoever; (ii) any damage to such property that results in an insurance settlement with respect to such property on the basis of a total loss or constructive total loss; (iii) the condemnation, confiscation or seizure of, or requisition of title to or use of, such property by the act of any government (foreign or domestic) or of any state or local authority or any instrumentality or agency of the foregoing ("Requisition of Use"); (iv) as a result of any rule, regulation, order or other action by any government (foreign or domestic) or governmental body (including, without limitation, the FAA or any similar foreign governmental body) having jurisdiction, the use of such property shall have been prohibited, or such property shall have been declared unfit for use, for a period of six (6) consecutive months, unless Borrower, prior to the expiration of such six-month period, shall have undertaken and, in the opinion of Lender, shall be diligently carrying forward all steps that are necessary or desirable to permit the normal use of such property by Borrower or, in any event, if use shall have been prohibited, or such property shall have been declared unfit for use, for a period of twelve (12) consecutive months; (v) with respect to an Engine or an APU, the removal thereof from the Airframe for a period of six (6) consecutive months or longer, whether or not such Engine or APU is operational; or (vi) an Engine or an APU is returned to the manufacturer thereof, other than for modification in the event of patent infringement or for repair or replacement (any such return being herein referred to as a "Return to Manufacturer"). The date of such Event of Loss shall be the date of such theft, disappearance, destruction, damage, Requisition of Use, prohibition, unfitness for use for the stated period, removal for the stated period or Return to Manufacturer.

FAA shall mean the United States Federal Aviation Administration and/or the Administrator of the Federal Aviation Administration and the Department of Transportation, or any Person, governmental department, bureau, authority, commission or agency succeeding the functions of any of the foregoing, including, where applicable, the Transportation Security Administration.

FARs shall mean the Federal Aviation Regulations, any Special Federal Aviation Regulations (Title 14 C.F.R. Part 1 et seq.), together with all successor regulations thereto.

GAAP shall mean generally accepted accounting principles consistently applied.

Guarantor shall mean James C. Justice, II.

Guaranty shall mean the Guaranty dated as the date hereof, by Guarantor in favor of Lender.

18

**IDERA** shall mean the Irrevocable De-Registration and Export Request Authorization executed by Borrower pursuant to Article XIII of the Aircraft Protocol, which IDERA shall be substantially in the form of Exhibit A hereto.

**Impositions** shall have the meaning set forth in Section 4.3 hereof.

**Liens** shall mean all liens, charges, security interests, leaseholds, International Interests and encumbrances of every nature and description whatever, including, without limitation, and rights of third parties under Third Party Agreements.

**Loan Documents** shall mean this Agreement, the Note, the Guaranty and any other documents, agreements or instruments securing, evidencing or relating to the Obligations.

**Material Damage** shall mean any damage: (a) required to be reported pursuant to any governmental reporting requirement, (b) with respect to which an insurance claim is being made, or (c) requiring that the Aircraft or any Engine be taken out of service for more than one (1) day to repair.

**Note** has the meaning ascribed to such term in Section 1.1.

**Obligations** shall mean: (i) the unpaid principal amount of, and accrued interest on, the Note; and (ii) all other indebtedness, obligations or liabilities of Borrower owing to Lender, or to any Affiliate of Lender, of every kind and description, direct or indirect, secured or unsecured, joint or several, absolute or contingent, due or to become due, whether for payment or performance, now existing or hereafter arising, including, but not limited to, all indebtedness, obligations or liabilities under, arising out of or in connection with this Agreement, the Note or any of the other Loan Documents.

**Parts** shall mean all appliances, avionics, parts, instruments, appurtenances, accessories, furnishings and other equipment of whatever nature (other than complete Engines) that may from time to time be incorporated or installed in or attached to the Airframe, any Engine or any APU, and any and all such appliances, avionics, parts, instruments, appurtenances, accessories, furnishings and other equipment removed therefrom so long as Lender shall retain a security interest therein in accordance with the applicable terms of this Agreement after such removal.

**Permitted Liens** shall mean (a) the respective rights of others under Third Party Agreements, if any, to the extent expressly provided and permitted by the terms of Section 4.4 of this Agreement, (b) Liens for taxes either not yet due or being contested by Borrower in good faith with due diligence and by appropriate proceedings, so long as such proceedings do not involve, in Lender's sole judgment, any material danger of the sale, foreclosure, transfer, forfeiture or loss of the Collateral, or title thereto, the rights of Lender hereunder or Lender's interest therein, and for the payment of which taxes adequate reserves shall have been established in accordance with GAAP or other appropriate provisions satisfactory to Lender have been made, and (c) inchoate materialmen's, mechanic's, workmen's, repairmen's, employee's, or other like Liens arising in the ordinary course of business of Borrower for sums not yet delinquent or being contested in good faith with due diligence and by appropriate proceedings, so long as such proceedings do not involve, in Lender's sole judgment, any material danger of the sale, foreclosure, transfer, forfeiture or loss of the Collateral, or title thereto, the rights of Lender hereunder or Lender's interest therein, and for the payment of which sums adequate reserves shall have been established in accordance with GAAP or other appropriate provisions satisfactory to Lender have been made.

**Person** shall mean any individual, partnership, corporation, limited liability company, trust, association, joint venture, joint stock company, or non-incorporated organization or government or any department or agency thereof, or any other entity of any kind whatsoever.

**Prepayment Fee** means the prepayment fee described on Annex B hereto.

**Proceeds** shall have the meaning assigned to it in the UCC, and in any event, shall include, but not be limited to, all goods, accounts, chattel paper, documents, instruments, general intangibles, investment property, deposit accounts, letter of credit rights, investment property, deposit accounts and supporting obligations (to the extent any of the

foregoing terms are defined in the UCC, any such foregoing terms shall have the meanings given to the same in the UCC), and all of Borrower's rights in and to any of the foregoing, and any and all rents, payments, charter hire and other amounts of any kind whatsoever due or payable under or in connection with the Aircraft, including, without limitation, (A) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to Borrower from time to time with respect to the Aircraft, (B) any and all payments (in any form whatsoever) made or due and payable to Borrower from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of the Aircraft by any governmental body, authority, bureau or agency or any other Person (whether or not acting under color of governmental authority), and (C) any and all other rents or profits or other amounts from time to time paid or payable under or in connection with the Aircraft.

Records shall mean any and all logs, manuals, certificates and data and inspection, modification, maintenance, engineering, technical, and overhaul records (whether in written or electronic form) with respect to the Aircraft, including, without limitation, all records (i) required to be maintained by the FAA or any other governmental agency or authority having jurisdiction with respect to the Aircraft or by any manufacturer or supplier of the Aircraft (or any part thereof) with respect to the enforcement of warranties or otherwise, all records (ii) evidencing Borrower's compliance with Applicable Standards, and (iii) with respect to any manufacturer's maintenance service program for the Airframe or Engines.

Registrar shall mean Aviareto, or any successor registrar of the International Registry thereto.

Supplier shall mean Scout Aviation (Bermuda) Ltd.

Third Party Agreements shall mean any and all leases, subleases, management agreements, interchange agreements, charter agreements, pooling agreements, timeshare agreements, overhaul agreements, repair agreements and any other similar agreements or arrangements of any kind whatsoever relating to the Aircraft or any part thereof.

Transportation Code shall mean Subtitle VII of Title 49 of the United States Code, as amended and recodified.

UCC shall mean the applicable Uniform Commercial Code as then in effect in the applicable jurisdiction.

**AIRCRAFT, FINANCIAL AND INSURANCE INFORMATION**

Principal Amount of the Loan:    $6,600,000.00

Required Liability and Damage Insurance Coverage:

  (A)  comprehensive aircraft and general liability insurance against bodily injury or property damage claims including, without limitation, contractual liability, premises damage, public liability, death and property damage liability, public and passenger legal liability coverage, and pollution coverage in the event of an accident, in an amount not less than $50,000,000.00 for each single occurrence,

  (B)  personal injury liability in an amount not less than $25,000,000.00,

  (C)  such other property damage insurance (exclusive of manufacturer's product liability insurance) with respect to the Aircraft as is of the type and in the amounts usually carried by companies engaged in the same or a similar business as Borrower, similarly situated with Borrower, and owning or operating similar aircraft and engines, and that covers risks of the kind customarily insured against by such companies, and

  (D)  insurance otherwise complying with the requirements of Section 4.6 hereof.

# ANNEX C

## AIRCRAFT DESCRIPTION

Agusta SpA model A109S helicopter (as described on the International Registry by free text entry as AGUSTA SPA model A109S with serial number 22102) that consists of the following components:

(a)    Airframe bearing FAA Registration Mark N54JJ and manufacturer's serial number 22102.

(b)    Two (2) Pratt & Whitney Canada model PW207C helicopter engines bearing manufacturer's serial numbers PCE-BH0273 and PCE-BH0277 (as described on the drop down menu on the International Registry as PRATT & WHITNEY CANADA model PW200 SERIES) (each of which has at least 1,750 pounds of thrust and/or 550 rated take-off horsepower or the equivalent thereof).

(c)    Standard avionics and equipment, all other accessories, additions, modifications and attachments to, and all replacements and substitutions for, any of the foregoing, all as more particularly described on Schedule A attached hereto and made a part hereof.

## AVIONICS & EQUIPMENT

- Pilot navigation instruments (LCD EADI and EHSI, stand-by ADI)
- Gyrocompass     C14     Honeywell
- Vertical gyro #1     46060-11     Flightline System
- Vertical gyro #2     VG-208     JET Electronics
- 3-axis duplex AFCS     SP711     Honeywell
- ADF     KR-87     Bendix/King
- Transponder (mode S)     KT-73     Bendix/King
- VHF #1 COM/NAV/GPS     GNS530     Garmin
- VHF #2 COM/NAV/GPS     GNS430     Garmin
- DME     KDM706A     Bendix/King
- Marker beacon     KMR675     Bendix/King
- Pilot ICS (including pilot/copilot control panel. mode controller, audio cabin control)
- AC power supply system (two inverters)

- Copilot flight/navigation instruments (LCD EADI and EHSI, barometric altimeter, airspeed indicator, VSI)
- Flight director with autotrim     FZ 702     Honeywell
- Radio altimeter     AA 300     Honeywell
- ELT     C406-2HM     Artex
- Moving map     KMD 550     Bendix/King
- Radio master switch with ground function
- EFIS pilot/copilot in command switch

TOGETHER WITH ALL ADDITIONS, ACCESSIONS, MODIFICATIONS, IMPROVEMENTS, REPLACEMENTS, SUBSTITUTIONS, AND ACCESSORIES THERETO AND THEREFOR, ALL AVIONICS, ONBOARD EQUIPMENT, LOOSE EQUIPMENT, MANUALS, DOCUMENTATION AND TECHNICAL PUBLICATIONS, NOW OWNED OR HEREAFTER ACQUIRED, AND ALL RECORDS AND LOGBOOKS (IN WRITTEN FORM OR AS COMPUTER DATA, DISCS OR TAPES, WHETHER NOW EXISTING OR HEREAFTER ACQUIRED OR CREATED, AND WHETHER IN THE POSSESSION OF CUSTOMER OR HELD ON BEHALF OF CUSTOMER BY OTHERS).

**BORROWER'S INFORMATION**

| | |
|---|---|
| Primary Hangar Location: | 360 Airport Circle<br>Beaver, West Virginia 25813 |
| Borrower's Chief Executive Offices<br>and Principal Place of Business: | 106 Lockheed Drive<br>Beaver, West Virginia 25813 |
| Borrower's Pilot's or Management Company's address: | 106 Lockheed Drive Beaver, West Virginia 25813<br>Contact: Tim White<br>Telephone: 304-252-1074 |
| Borrower's form of Organization,<br>State of Organization and<br>Organizational Identification Number | Limited Liability Company<br>West Virginia<br>51639 |
| Borrower's administrator: | Leda Francis |
| Borrower's professional user entity: | Insured Aircraft Title Service, Inc. |

## FORM OF IRREVOCABLE DE-REGISTRATION AND EXPORT REQUEST AUTHORIZATION

This IDERA is linked to and part of that certain grant of security set forth in the Loan and Aircraft Security Agreement (S/N _____) dated _____, 20____ by and between **RBS ASSET FINANCE, INC.** (together with its successors and assigns, if any, "Lender") and _____ (together with its successors and permitted assigns, if any, "Borrower"), which is being filed with the Federal Aviation Administration contemporaneously herewith.

[Insert Date]

To:     Federal Aviation Administration, Civil Aircraft Registry

Re:     Irrevocable De-Registration and Export Request Authorization

The undersigned is the registered owner of the **[insert the airframe/helicopter manufacturer name and model number]** (as described on the drop down menu on the International Registry as _____ model_ _____) bearing manufacturer's serial number **[insert manufacturer's serial number]** and registration number **[insert registration number/mark]** (together with all installed, incorporated or attached accessories, parts and equipment, the "Aircraft").

This instrument is an irrevocable de-registration and export request authorization issued by the undersigned in favor of RBS Asset Finance, Inc. (the "Authorized Party") under the authority of Article XIII of the Protocol to the Convention on International Interests in Mobile Equipment on Matters specific to Aircraft Equipment. In accordance with that Article, the undersigned hereby requests:

(i)     recognition that the authorized party or the person it certifies as its designee is the sole person entitled to:

(a)     procure the de-registration of the Aircraft from the Civil Aircraft Registry maintained by the Federal Aviation Administration for the purposes of Chapter III of the *Convention on International Civil Aviation*, signed at Chicago, on 7 December 1944, and

(b)     procure the export and physical transfer of the Aircraft from the United States of America; and

(ii)    confirmation that the Authorized Party or the person it certifies as its designee may take the action specified in clause (i) above on written demand without the consent of the undersigned and that, upon such demand, the authorities in the United States of America shall co-operate with the Authorized Party with a view to the speedy completion of such action.

The rights in favor of the Authorized Party established by this instrument may not be revoked by the undersigned without the written consent of the Authorized Party.

[SIGNATURE PAGE FOLLOWS]

Please acknowledge your agreement to this request and its terms by appropriate notation in the space provided below and lodging this instrument in Civil Aviation Registry of the Federal Aviation Administration.

Agreed to and lodged this ___ day of _____, 20___.

[BORROWER]


By:_____
Name:_____
Title:_____

CLOSING TERMS ADDENDUM ("Closing Terms Addendum") to Loan and Aircraft Security Agreement (S/N 22102) dated as of December _____, 2009 (the "Agreement"), by and between RBS ASSET FINANCE, INC., as lender ("Lender"), and JUSTICE AVIATION, LLC, as Borrower ("Borrower").

All capitalized terms not defined in this Closing Terms Addendum are defined in the Agreement. Execution of the Agreement by Borrower and Lender shall be deemed to constitute execution and acceptance of the terms and conditions of this Closing Terms Addendum, and it shall supplement and be a part of the Agreement.

Conditions Precedent:

1.    On or prior to the Closing Date and at least one full Business Day prior to closing, Lender shall have received all of the following, in form and substance satisfactory to Lender:

(a)    the Agreement, the Note and the other Loan Documents duly executed by Borrower, together with the Lease and the Consent to Lease;

(b)    the Guaranty dated as of the Closing Date, by James C. Justice, II ("Guarantor") in favor of Lender (the "Guaranty") duly executed by Guarantor;

(c)    if required by Lender, an opinion of counsel for Borrower[and Guarantor addressed to Lender as to such matters incident to the Loan as Lender may reasonably require;

(d)    Certificate(s) of good standing for Borrower and Lessee from its/their state(s) of organization and the state(s) where the primary hangar location of the Aircraft and Borrower's chief executive offices and principal place of business are located;

(e)    a certificate for Borrower and Lessee executed by Borrower's and Lessee's secretary or other authorized representative certifying: (i) that the execution, delivery and performance of the Agreement and the other Loan Documents and the entry by Borrower and Lessee into the transactions contemplated hereby and thereby have been duly authorized; (ii) the name(s) of the Person(s) authorized to execute and deliver such documents on behalf of Borrower and Lessee together with specimen signature(s) of such Person(s); and (iii) Borrower's and Lessee's charter and by-laws, operating agreement and other organizational documents, as applicable;

(f)    evidence as to the insurance coverage required under the Agreement, including, but not limited to, a certificate of insurance, copies of endorsements (including a Lender endorsement), and, if requested by Lender, copies of applicable policies and written confirmation from the insurance underwriter or broker that the insurance coverage provided is in compliance with the requirements of Section 4.6 of the Agreement;

(g)    if required by Lender, an inspection report and/or appraisal satisfactory to Lender with respect to the Aircraft prepared by inspector(s) or appraiser(s) acceptable to Lender;

(h)    copies of: (i) any purchase agreements entered into by Borrower in connection with the acquisition of the Aircraft, (ii) the warranty bill of sale conveying title to the Aircraft from seller or vendor to Borrower; (iii) if required by Lender, invoices for the purchase of the Aircraft, and (iv) such other documents relating to the purchase or conveyance of title as Lender may request;

(i)    copies of the executed FAA Aircraft Registration Application (AC Form 8050-1), FAA Bill of Sale (AC Form 8050-2), executed FAA Entry Point Filing Forms (AC Form 8050-135) and FAA Standard Airworthiness Certificate (AC Form 8100-2) for the Aircraft;

(j)    if applicable, a LLC Application or statement acceptable to the FAA;

(k)    fully executed and authorized discharges of any international interests in form and substance satisfactory to Aviation Counsel, Lender's counsel and/or Lender;

(l)    AC Form 8050-135 FAA Entry Point Filing Forms International Registry, duly executed and in proper form for filing with the FAA, with respect to this Agreement, any associated rights and the sale of the Aircraft;

(m)    evidence that Borrower and Lessee are each a transacting user entity of the International Registry and that each has designated a professional user entity satisfactory to Lender;

(n)    a Priority Search Certificate from the International Registry addressed to Lender indicating that the Aircraft is free and clear of Liens, and, on the Closing Date, confirmation from Aviation Counsel that a Priority Search Certificate from the International Registry indicates that the Aircraft is free and clear of Liens;

(o)    such other documents, certificates and opinions, and evidence of such other matters, as Lender, Lender's counsel or Aviation Counsel, may reasonably request and as are necessary, in the opinion of Aviation Counsel, to (1) perfect with the FAA Lender's security interest in the Aircraft, free and clear of Liens (2) terminate, discharge and otherwise release any Interests such that the Aircraft is free and clear of Liens (other than Permitted Liens) and (3) register Lender's international interest in the Airframe and Engines and any associated rights thereto pursuant to the Cape Town Convention, free and clear of Liens.

2.    On or prior to the Closing Date, Lender shall have received evidence that Aviation Counsel has received in escrow: (i) if the Aircraft is not then owned by Borrower, the executed FAA Aircraft Bill of Sale (AC Form 8050-2) in the name of Borrower, the executed FAA Aircraft Registration Application (AC Form 8050-1) in the name of Borrower (except for the pink copy, which shall be available to be placed on the Aircraft upon acceptance thereof) and executed FAA Entry Point Filing Forms (AC Form 8050-135); (ii) executed releases (including, without limitation, any discharges of International Interests) in form and substance satisfactory to Aviation Counsel of any Liens on the Aircraft; (iii) such other documents as are necessary, in the opinion of Lender's counsel and/or Aviation Counsel to vest good title to the Aircraft in the name of Borrower and to perfect Lender's first priority security interest in the Aircraft; and (iv) the executed original of the Agreement, all the foregoing being in proper form for filing with the FAA.

3.    On the Closing Date, Lender shall have received assurances from Aviation Counsel satisfactory to Lender, in form and substance satisfactory to Lender, that (i) the Aircraft (including the Airframe and Engines) is free and clear of all other Liens of record with the FAA and the International Registry, (ii) title to the Airframe is vested in Borrower, (iii) Lender, upon filing of the Agreement with the FAA and registering the international interest with the International Registry, will have a valid, perfected first priority security interest and international interest in the Aircraft (including the Airframe and the Engines), (iv) the filing of the Agreement with the FAA has been effected; and (v) the registration of the international interests has been consented to by all parties that said international interests are searchable at the International Registry.

4.    Before the Closing Date, Lender and Aviation Counsel shall receive confirmation (which confirmation shall be satisfactory to Lender and Aviation Counsel) by the Aircraft Seller's, Borrower's and Lessee's respective professional user entities that each such party has consented to the registration of all international interests (including all required final consents).

5.    On the Closing Date, Lender shall receive a priority search certificate from the International Registry addressed to Lender evidencing that the sale of the Aircraft to Borrower, Lender's international interests in the Aircraft and any associated rights, together with the Lease have been duly registered therein and are searchable.