I6j1citc

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  CITIZENS ASSET FINANCE, INC.,

4           Plaintiff,

5        v.                          17 Civ. 7115 (AJN)

6  JUSTICE AVIATION, LLC, et al.,

7           Defendants.             Conference

8  ------------------------------x
                                    New York, N.Y.
9                                   June 19, 2018
                                    4:36 p.m.
10
   Before:
11
                    HON. ALISON J. NATHAN,
12
                                    District Judge
13
                         APPEARANCES
14
   VEDDER, PRICE, P.C.
15      Attorneys for Plaintiff
   BY:  WILLIAM W. THORSNESS, ESQ.
16
   ZIELKE LAW FIRM
17      Attorneys for Defendants
   BY:  JOHN H. DWYER, JR., ESQ.
18

19

20

21

22

23

24

25

1          (Case called)

2          THE COURT:  I'll take appearances of counsel, starting

3     with the plaintiff.

4          MR. THORSNESS:  Good afternoon, your Honor.  Bill

5     Thorsness for plaintiff Citizens Finance.

6          THE COURT:  Good afternoon, Mr. Thorsness.

7          And for the defendant.

8          MR. DWYER:  For the defendant, your Honor, John Dwyer.

9          THE COURT:  Good afternoon, Mr. Dwyer.

10          All right.  We're here for a scheduling and status

11     conference in this matter following the close of fact

12     discovery.

13          I'm in receipt of the parties' letter, which came in

14     May 18th in advance of this conference.  I think we had some

15     adjournments so it's a little bit dated at this point, but you

16     indicated in the order that fact discovery is closed in this

17     matter, is that correct?

18          MR. THORSNESS:  Yes, your Honor.

19          MR. DWYER:  Yes, your Honor.

20          THE COURT:  Okay.  And is there expert discovery?

21          MR. THORSNESS:  No, your Honor.

22          MR. DWYER:  No, your Honor.

23          THE COURT:  All right.  So discovery is closed.

24          Now I know that I have a pending motion to dismiss on

25     the counterclaim, which I think is basically repeated now in

1    the pending motion to dismiss the pending summary judgment

2    motion with respect to the counterclaim, is that right?

3            MR. THORSNESS:  Your Honor, we did incorporate --

4    there are legal arguments strictly in a motion to dismiss.  The

5    summary judgment motion on the counterclaim also raises factual

6    bases to dismiss -- I mean, to grant summary judgment based on

7    the documents that were produced for discovery.

8            THE COURT:  Okay.  But all of the legal arguments from

9    the motion to dismiss are incorporated in the summary judgment

10   motion.

11           MR. THORSNESS:  Absolutely, Judge.

12           THE COURT:  So if we're going forward with the summary

13   judgment motion, there's no need to tackle both.  You could

14   withdraw or I could dismiss as moot the motion to dismiss and

15   just deal with the issues raised in the summary judgment

16   motion.

17           MR. THORSNESS:  Certainly if you grant the summary

18   judgment motion on the counterclaim, your Honor, the motion to

19   dismiss would be moot.  We did not articulate, for brevity, all

20   of the additional legal reasons that we set forth in the motion

21   to dismiss.

22           THE COURT:  Incorporated in the --

23           MR. THORSNESS:  Yes.  So for example, waiver

24   arguments, your Honor, no duty exists as a matter of law, those

25   kinds of things are not repeated verbatim in the summary

1    judgment motion, so we did stick to really factual issues in

2    the summary judgment motion, Judge.

3              THE COURT:  And the summary judgment motion, am I

4    right, it's fully briefed now?

5              MR. DWYER:  Yes, your Honor.  It's submitted.

6              THE COURT:  And Mr. Dwyer, from the defense

7    perspective, I mean, I guess there's a couple of things.  I

8    gather it came in before close of discovery.  It also did come

9    in, and as I think you've noted, I typically try to discourage

10   summary judgment practice in bench trials, unless there are

11   circumstances that make it a good use of resources.  And you

12   tell me.  I mean, the reason for that is, I think most

13   efficient is a bench trial, which is basically just a big

14   summary judgment motion with the opportunity to cross-examine

15   fact witnesses, because I take direct testimony by declaration

16   for bench trials, rather than sort of coming through the record

17   and determining whether or not there's a material issue in

18   dispute.  Why not just get to final resolution as quickly as

19   possible?  So that's typically my posture with respect to

20   summary judgment.

21             Now sometimes lawyers say, but here's a good reason to

22   do this, it substantially would narrow the scope of trial, we

23   would need two witnesses rather than eight witnesses to come in

24   for cross-examination, it would substantially impact our

25   settlement discussions going forward, etc.  So sometimes there

1      is good reason.  But my general posture is, let's just get it

2      resolved once and for all.

3              Mr. Dwyer, with respect to your opposition to the

4      summary judgment motion -- and it's in the queue but I haven't

5      gotten to it yet -- do you have a position with respect to the

6      filing of that motion prior to the close of fact discovery?

7              MR. DWYER:  Not to that, no.  I don't think the fact

8      that it was filed before fact discovery has any real impact in

9      it.

10             THE COURT:  You had what you needed to file the

11     motion.

12             MR. DWYER:  Yes.

13             THE COURT:  As the counterclaim plaintiff, do you have

14     a position with respect to resolution of the summary judgment

15     motion pretrial?

16             MR. DWYER:  I understand what the Court said,

17     particularly about taking testimony by declaration.  I think

18     the factual disputes that we've set up in the summary judgment

19     response relate essentially solely to the counterclaim.

20     There's a dispute about the handling of the collateral and the

21     sale of the collateral, and there's some perception differences

22     in who had the duty to do what and what the consequences were

23     of waiting this period of time, so those are the real factual

24     issues.  I think they could probably be fleshed out a little

25     bit in a bench trial better than a summary judgment motion, but

1  it's not dramatically complex.  I think we'd be dealing with

2  the same witnesses, the example you gave, but I don't think

3  it's going to cut the number of witnesses any at all to do a

4  bench trial, or the summary judgment is not going to limit the

5  number of witnesses.  It's going to be the same folks, unless

6  it's totally granted.

7          THE COURT:  Mr. Thorsness?

8          MR. THORSNESS:  Thank you, your Honor.

9          So your Honor, first, we did take substantial caution

10  and we did not file a motion for summary judgment before fact

11  discovery closed.  We did ensure that it was done.  We

12  certainly understand your standing orders, and we did comply

13  with that, your Honor.  I just wanted to clear that up.

14          Number two, Judge, the reason why summary judgment

15  is -- there is good cause, here, there is nothing in dispute.

16  Ignore the counterclaim, for example.  There's a $2.5 million

17  deficiency on an aircraft loan that was not paid.  Before the

18  suit was ever filed, there was a forbearance agreement, and I

19  certainly don't need to explain to the Court what that

20  necessarily means in a commercial lending relationship.

21  Everything was admitted to, the defaults were admitted to, the

22  debt was admitted to, waivers, releases, etc.  We see it all

23  the time.  Before filing suit.  Subsequent to filing suit, the

24  aircraft was sold and requests to admit were answered, all in

25  the affirmative, substantively, and then in the summary

1    judgment opposition, Judge, nothing was disputed, on the

2    affirmative claims.  The 2.4 million on the breach of contract

3    under Justice Aviation, which is the borrower, and the

4    2.4 million and change against the guarantor, who, of course,

5    happens to be a currently sitting governor -- and I wanted to

6    make clear for the Court as well that the bank, they did not

7    want to file this suit.  Certainly a national bank like

8    Citizens does not take any joy in suing sitting politicians.  I

9    mention that, Judge, because this is kind of an aberration.  I

10   do a lot of financial institution work, and banks want to get

11   paid, certainly, but they do not want to raise public ire, or

12   suing a sitting governor is not something they take joy in.

13   That should help explain how challenging it has been to get

14   movement in this case; movement in terms of any kind of

15   settlement to address this deficiency, and why summary judgment

16   is compelled, Judge, you can frankly rubber stamp a judgment on

17   the affirmative claims today, but for the counterclaim, and we

18   can talk about that.  And I think the same conclusion follows.

19   Because there's nothing that's disputed, on the affirmative

20   claims.

21            THE COURT:  But that makes it sound like if we go to

22   trial, it's all about the counterclaims.

23            MR. THORSNESS:  And I haven't gotten to that, Judge,

24   and I was getting there.

25            And before I get to the counterclaim, Judge, you had

I6j1citc

1    mentioned substantially advancing settlement opportunities.  I

2    believe, personally, having lived with this for about a year

3    and a half now, that in order to get the guarantor's attention,

4    a judgment would certainly advance that, Judge.  I don't want

5    to guess or speculate or even, you know, repeat conversations

6    that I've had with counsel, but we have gotten, you know,

7    nowhere on advancing settlement, Judge, and the bank can't do

8    anything.  They're out $2½ million, and they want to move this

9    forward, and so we filed summary judgment.  Defendants didn't

10    take any depositions because there's no fact issues, Judge, and

11    there was no discovery disputes, which I appreciated.

12           So on that respect, even setting aside the

13    counterclaim, entering judgment on the affirmative claims today

14    would substantially impact the opportunity for potential

15    settlement in advance of any enforcement actions, Judge, and

16    excluding the counterclaim, you can enter full judgment on the

17    guarantee because the counterclaim does not impact Count Two.

18    It only impacts a $100,000 offset on Count One.  And there are

19    probably 15 different reasons, Judge, why the counterclaim

20    summary judgment, or dismissal on that should be granted.  I'm

21    prepared to go through each of those today.  I think from a

22    very high-level perspective, what they are saying is that a

23    bank not responding to a purchase offer by a borrower within

24    two hours and losing a sale is, as a matter of law, a violation

25    of the covenant of good faith and fair dealing.  Now, I mean,

1    we don't argue public policy, but at the end of the day, that's

2    a big issue, and I think on a public policy basis, if that were

3    sustainable, as a matter of law, that impacts commercial

4    lending relationship, because any borrower is going to throw up

5    anything up against the wall to suggest that it can be

6    unreasonable for a lender to do this, that, or the other thing

7    when 25 pages of loan documents, the forbearance agreement --

8    and the lender is trying to protect its collateral.  We think

9    that the counterclaim can't be sustained, and that's public

10   policy reason, Judge, but I mention that first because it is

11   important.

12              THE COURT:  Okay.  So at least at the end there, or

13   somewhere in that, you maintain the position I should resolve

14   the summary judgment motion on the counterclaim and then

15   because it's important for settlement purposes.  But it also

16   seemed like what you were saying was proceeding with respect to

17   the affirmative claims, the initial claims, in some summary way

18   as well, no?

19              MR. THORSNESS:  I'm sorry, Judge.  We moved for

20   summary judgment on everything.  My first long spiel there was

21   the affirmative claims, breach of contract, breach of

22   guarantee.  There's no dispute, there's no factual dispute

23   whatsoever, other than a hundred-thousand-dollar offset, which

24   is this counterclaim on Count One.  And --

25              THE COURT:  And again, it's in the queue and I haven't

I6j1citc

1  gotten to it yet, so I misunderstood.  But you have moved, the

2  plaintiff has moved for summary judgment with respect to the

3  asserted plaintiff's claims.

4           MR. THORSNESS:  Oh, yes, Judge.

5           THE COURT:  And you moved on behalf of Citizens for

6  summary judgment with respect to the counterclaims.

7           MR. THORSNESS:  Correct, your Honor.

8           THE COURT:  Okay.  Understood.

9           Mr. Dwyer.

10          MR. DWYER:  Well, we disagree.  I mean, the two-hour

11  comment I think lays out the fact dispute.  The bank thinks

12  that it's a two-hour issue, we think it's a six-day issue.

13  There's email back and forth between in-house counsel and, you

14  know, what's sufficient notice to tell them that we need a

15  decision, we've got a seven-day contract, you don't give us

16  authorization till I think over six days, and so we lost the

17  deal.

18          THE COURT:  I understand that position with respect to

19  your assertion of disputed facts with respect to the

20  counterclaim.  What about with respect to, in your posture as

21  defendant, opposing summary judgment with respect to the

22  affirmative claims asserted by Citizens?

23          MR. DWYER:  Based on the statement of material facts

24  and the responses that we made to that, I don't think there are

25  any real disputes over the affirmative claim.  The fact dispute

I6j1citc

1    here is going to be on the counterclaim.

2              THE COURT:  So, I mean, I suppose in that sense it

3    would substantially alter the course of trial if I were to

4    rule -- I mean, it sounds like almost on consent, but I get

5    that it's not consent.  I take it back.  I understand.  I don't

6    mean on consent.  But tell me if this is right.  In your

7    opposition to the motion for summary judgment, does the

8    defendant provide argument opposing summary judgment on the

9    plaintiff's affirmative claims?

10             MR. DWYER:  No.

11             THE COURT:  Okay.

12             MR. DWYER:  No.  And we've admitted the authenticity

13   of the loan agreement, the security agreements, the forbearance

14   agreement, those documents are --

15             THE COURT:  So is there any reason I don't just orally

16   grant today the plaintiff's motion for summary judgment with

17   respect to the affirmative claims?

18             MR. DWYER:  On liability.  There's obviously a

19   question what the damages are.

20             THE COURT:  On liability.

21             MR. DWYER:  I don't -- I hate admitting this, but I

22   don't think that we've really put anything in the record that

23   could stop you from doing that.

24             THE COURT:  All right.  So I think I don't need to

25   waste anybody's resources.  I will grant the plaintiff's motion

1    for summary judgment, with respect to liability.  Based on the

2    motion for summary judgment papers, including the 56.1

3    statements and disputed facts, there are no material issues of

4    disputed fact with respect to liability with respect to

5    plaintiff's claims.  So summary judgment is granted with

6    respect to the plaintiff, with respect to liability on the

7    plaintiff's affirmative claims.

8         And does the damages question turn on the counterclaim

9    or other facts?

10         MR. DWYER:  On the counterclaim, they've put their

11   calculation of the balance in, and I don't believe we've

12   disputed that, so I think that the damages are going to turn on

13   the counterclaim.

14         THE COURT:  All right.  And if we proceed to trial on

15   that, Mr. Dwyer, what does trial look like from counterclaim

16   plaintiff's perspective?

17         MR. DWYER:  It looks like primarily two witnesses.

18   The complicating factor is, one of those witnesses is

19   Mr. Lipke, who is counsel for the plaintiff, who was personally

20   conducting the settlement negotiations and was the point of

21   contact on the negotiation.  The other witness would be Dustin

22   Dean, who is in-house counsel at the time for Justice, who was

23   acting in that role for them.  So there is a bit of a quirk in

24   terms of proof on that because counsel was involved in

25   negotiating it and counsel was involved in selling the asset.

1   But those would be the two -- the only two witnesses I think

2   would be absolutely necessary for trial.  But --

3              THE COURT:  And does your summary judgment opposition

4   include declarations of Lipke and Dean?

5              MR. DWYER:  No, it does not include declarations from

6   them.  It refers mostly to emails that were included in

7   declarations.  They put in everything in their motion so we

8   just referred to their declarations.

9              THE COURT:  Okay.

10             MR. DWYER:  It's almost entirely email traffic between

11  those two gentlemen.

12             THE COURT:  So for your case, if we're proceeding to

13  bench trial, you'd present declarations from them?

14             MR. DWYER:  I'm not sure I can get a declaration from

15  Mr. Lipke, since he's opposing counsel.  I can certainly get

16  one --

17             THE COURT:  So you would call him as an adversarial

18  witness.

19             MR. DWYER:  I would have to, yeah.

20             THE COURT:  Understood.  And then Dean you would put

21  in a declaration?

22             MR. DWYER:  I would plan to do that, yes.

23             THE COURT:  One live witness for affirmative testimony

24  and then a declaration witness who would be available for

25  cross-examination.  Mr. Thorsness, from your perspective, what

1   would trial look like?

2           MR. THORSNESS:  Sure, your Honor.  And the damages on

3   the counterclaim is only relevant to Count One.  Damages is not

4   relevant at all on Count Two.  The defendants did not oppose,

5   did not rebut that argument in our summary judgment motion.  A

6   guarantor does not get any defenses of the borrower, especially

7   if it's an absolute unconditional guarantee.  We cited Second

8   Circuit law and I believe law of this district as well, Judge.

9   So on the witnesses, and this is a hundred-thousand-dollar

10  issue, Judge.

11          THE COURT:  Yes.

12          MR. THORSNESS:  Also just for the Court, to the

13  extent -- we likely will collectively burn through a hundred

14  thousand dollars preparing for trial and conducting trial, but

15  be that as it may, Mr. Lipke --

16          THE COURT:  And I recognize that and I appreciate it,

17  but that doesn't answer the question of whether there's a

18  disputed issue of fact.  What it should do is motivate

19  everybody to settle if there is a disputed issue of fact.

20          MR. THORSNESS:  Absolutely understood, your Honor.

21  And I just raise that for the Court and there's probably five

22  documents that we attached to our summary judgment motion that

23  your Honor would -- if you did consider the motion, would need

24  to review to kind of just grant judgment on that as well, but

25  to answer your question -- long way around it -- your Honor,

1  Mr. Lipke is the head of our reorganization group in Chicago.

2  Of course if subpoenaed to testify, he would testify.  We'd

3  have to review that.  But in any event, on our side, we would

4  want to call, at a minimum, Mr. Justice's son, who is the

5  principal architect of the negotiations of this helicopter

6  sale, which has been admitted.  We may also need to call the

7  governor as well.  Number one is absolute, number two is

8  potential.  But three and four are also absolute, and the

9  potential buyer who walked, who I'm not sure where he is, but

10  he may be in one of the -- he may be in the Caribbean.  The

11  fourth is the broker retained by Justice Aviation to sell the

12  aircraft, and the reasons for why the aircraft were -- the

13  initial sale was lost.  And that's all fleshed out in the

14  emails, Judge, but we foresee at least that happening.

15          THE COURT:  Okay.  And let me just ask briefly, just

16  so I understand.  As I said, I haven't gotten through the

17  papers yet, but you say two hours, the other side says six

18  days.  Why isn't that a disputed issue of fact?

19          MR. THORSNESS:  It turns on when the covenant of good

20  faith and fair dealing triggered.  So on July 6, 2017, the

21  borrower got an offer for $2.2 million to sell the aircraft.

22  They emailed my partner, Mr. Lipke:  "We got this offer.  Do

23  you want us to accept it?"  That's what the email said.  And

24  this is all in conjunction with ongoing emails, trying to set

25  up a call to talk about the 2½, $3 million inevitable

1    deficiency.  So the email was:  "We got this offer.  Would you

2    like us to accept it?"  No comments about, this is a seven-day

3    offer, it's going to expire, this is an urgent sale, we've got

4    to hear back from you immediately.  Nothing.

5         Another five days go past, go by, without borrower's

6    counsel following up on that potential sale.  In those five

7    days the borrower is negotiating the price with a buyer, trying

8    to get a higher amount, with the broker telling the borrower

9    that you could lose this if you keep pushing that kind of

10   thing.

11        July 11th comes around.  They email Mr. Lipke again,

12   saying the offer might -- may be able to be up $50,000 and it

13   may be for another week or so.  Do you want us to accept?  Will

14   Citizens release its lien?  No comments on the urgency, no

15   comments on the buyer could walk at any moment.  Then Mr. Lipke

16   responds, and I don't know, as I sit here today, this moment,

17   what exactly he responded, but the next morning, at 8 a.m. on

18   July 12th, there was an email from Mr. Dean, the borrower's

19   lawyer, stressing the urgency for the first time of getting

20   back to us on whether we can accept the deal.  Within two hours

21   Mr. Lipke confirmed with Citizens, based on some conditions

22   that they had to meet, including that it was an arm's length

23   deal and the purchase price was fair market value, that yes,

24   Citizens will release its lien if you get this price and it's

25   an arm's length deal.  So within being notified, within two

1    hours of being notified of the urgency of the sale, we

2    consented to it.  And now this is a default scenario, your

3    Honor, where the bank knows it's going to be out a couple of

4    million dollars.  It wants to ensure that the collateral, its

5    only piece of recovery, you know, but for the governor, who we

6    believe is a billionaire, is worth -- it's maximizing the value

7    of that collateral when it sells it.  And so its concern was

8    being out $2½ million and not walking away from its collateral

9    without asking a couple of additional questions.  So two hours

10   is the day of July 12th between the first notice of urgency and

11   our response.  The six days is when the offer was initially

12   emailed to Mr. Lipke.

13           THE COURT:  All right.  Well, I think given that it's

14   fully briefed, and we've limited what remains of the summary

15   judgment motion pending before me to the counterclaim

16   arguments, right, at this point, I'll resolve that, and I think

17   if I conclude that there's a genuine issue of material fact,

18   I'm not going to spend a lot of time with an extensive opinion.

19   I'll just let you know that and we'll come in and we'll

20   schedule trial, and hopefully at that point you'll reach

21   settlement.  But I think since it's fully briefed, in light of

22   what's represented, I should tackle that issue and then bring

23   you back in.

24           MR. THORSNESS:  Thank you, your Honor.

25           MR. DWYER:  Thank you, your Honor.

1          THE COURT:  All right.  And I think in your papers

2   you'd said there was some interest in referral to the

3   magistrate judge for mediation, for a settlement conference.

4   Is that still of interest?  Probably do that now that I just

5   said I'm going to rule on the summary judgment motion.

6          MR. DWYER:  I believe there's interest in trying to

7   mediate.  Bill and I have been talking about this.  We've been

8   talking with the clients.  Mr. Dean and Mr. Lipke, the reason

9   they were in communications, they were trying to resolve this.

10  I don't know how much help a mediator is going to provide these

11  type of parties.  I will agree with Bill to this extent, that

12  writing in and saying that the Court entered judgment on

13  liability will get their attention, possibly more than a

14  magistrate.  And Citizen has been insistent on having the

15  governor attend personally.  We tried to get them to agree to

16  come to West Virginia, to Greenbrier, which the governor

17  happens to own, for mediation.  They don't want to do that.

18  They want to come here.  And I have some concerns about getting

19  the governor to commit to come here for purposes of mediation.

20  Jay, his son, would be another story, I think, if we could come

21  on behalf of Justice Aviation.  I'm not a hundred percent sure

22  how helpful that would be, honestly.

23         THE COURT:  Well, so it sounds like no request at this

24  point --

25         MR. DWYER:  Not from the defendants, no.

1          THE COURT:  All right.  Well, I ruled on the

2    plaintiff's affirmative claims with respect to liability.  Take

3    that to your clients and see if that moves things along.  Why

4    don't you let me know.  You can tell them that the judge wants

5    to know within two weeks' time whether you'd like the referral

6    to the magistrate judge for a settlement conference at this

7    point.  If the answer is no, the answer is no.  I'll resolve

8    what remains of the summary judgment motion.  And, look, I'd be

9    happy to take one motion off my queue, so if all we're talking

10   about is a hundred thousand dollars, try to get to settlement

11   before I rule, and just let me know.

12          MR. DWYER:  We'll let you know immediately if we can

13   do that, your Honor.

14          THE COURT:  And otherwise, I'll give you resolution to

15   the summary judgment on the counterclaim, and then if it

16   proceeds, I'll bring you back in.

17          MR. DWYER:  Thank you, your Honor.

18          THE COURT:  What else can I address?

19          MR. THORSNESS:  Thank you, your Honor.  On the

20   two-week letter, would you like us to submit a joint letter on

21   that?

22          THE COURT:  Yes, just a joint letter, either telling

23   me that you've settled or telling me that you haven't settled

24   but you would like the referral to the magistrate judge or

25   telling me that you're not seeking any settlement assistance at

I6j1citc

1    this time.

2              MR. THORSNESS:  Okay.

3              THE COURT:  Okay.

4              MR. THORSNESS:  Thank you, your Honor.  Thank you for

5    accommodating our schedule as well.

6              THE COURT:  Okay.  Anything else?

7              MR. DWYER:  That's it.  Thank you.

8              THE COURT:  Thank you.  We're adjourned.

9              THE DEPUTY CLERK:  All rise.

10                                  o0o

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25